HULL, Circuit Judge:
After a jury trial, defendants Renado Smith and Richard Delancy appeal their convictions for conspiracy to commit alien smuggling, alien smuggling, and attempted illegal reentry. Both defendants argue that at trial the district court erred in admitting the videotaped deposition testimony of passenger Vanessa Armstrong Vixama, a smuggled alien in their boat. Smith also argues that the prosecutor's improper comments to the jury during closing argument warrant a new trial. After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm Smith and Delancy's convictions.
I. TRIAL EVIDENCE
We recount the overwhelming trial evidence of alien smuggling in this case.
For starters, on November 4, 2016, defendants Smith and Delancy, both Bahamian nationals, set out from Freeport, Bahamas on a 24-foot Grady White boat with 21 passengers. Smith was the operator of the vessel, and Delancy assisted him.
*1219 Of the 21 passengers on the boat, 20 were Haitian nationals, including Vixama, and one was a Bahamian national. Sometime after leaving Freeport, this small boat ran out of fuel and drifted at sea for approximately six days. There was little water and no food on the boat.
Fortunately for the passengers, on November 9, 2016, a U.S. Customs and Border Protection ("CBP") aircraft, conducting a routine border security patrol, spotted the boat drifting about 24 miles off the coast of Key Largo, Florida. The boat was also about 24 miles to the southwest of Bimini, Bahamas and was drifting in a northerly direction with the Gulf Stream current. The CBP aircraft personnel notified the U.S. Coast Guard of the boat's position and continued to monitor the boat from the air until a Coast Guard vessel arrived.
A Coast Guard cutter was dispatched to the boat's location and used a small boat to ferry passengers from the disabled boat to the cutter. The passengers, who were tired and dehydrated but otherwise in good health, were eager to leave the disabled boat. Smith and Delancy, however, asked Coast Guard personnel to supply the two of them with water and fuel to continue their trip. A Coast Guard officer advised them that the Coast Guard could not provide them with fuel, and Smith and Delancy agreed to board the cutter.
At the time, Smith and Delancy claimed that they were taking the passengers to Bimini, Bahamas. Coast Guard officers testified, however, that they were skeptical of the defendants' claims because they "didn't make sense." The officers explained that the boat was found south of Bimini, approximately halfway between Bimini and Key Largo. Because the current in that area generally travels north, it would not make sense for the boat to have drifted south past Bimini after becoming disabled. Both officers acknowledged, however, that because the boat had been adrift for six days, it would be difficult to determine what the boat's original route had been.
The CBP aircraft pilot who located the boat testified that, in his experience, vessels traveling from the Bahamas to the United States do not always take a straight route and sometimes take evasive actions to "disguise exactly what they're doing." Similarly, Homeland Security Investigations ("HSI") Agent Craig Nowicki, the case agent, testified that people involved in smuggling aliens "find various routes to avoid law enforcement detection."
The Coast Guard processed all 23 people who were taken off the boat (including Smith and Delancy). None of the 21 passengers had any identification documents with them, nor did they have permission to enter or reside in the United States. Smith and Delancy both were previously removed from the United States and did not have permission to reenter.
In addition to the location of the boat, there was other considerable evidence showing that the defendants were bringing the aliens to the United States, not Bimini. For example, this was not even the defendants' first attempt to illegally enter the United States. Smith had a prior June 2013 conviction for alien smuggling for profit, and Delancy had a prior November 2013 conviction for illegal reentry after deportation. As discussed later, the first page of each judgment of conviction was admitted into evidence at trial. Among other things, those judgments reflected: (1) that both defendants' prior convictions took place in the West Palm Beach Division of the Southern District of Florida; (2) the dates of each defendant's prior offense and conviction; (3) the statute under which each defendant was convicted; and (4) the nature of the offense.
*1220 Two of the boat's passengers also testified they believed the boat was headed to the United States. Specifically, two passengers gave videotaped depositions that were played for the jury and admitted into evidence at trial. As discussed in greater detail below, the defendants did not object to the admission of one passenger's deposition (that of Davidson Francois), but did object to the other (that of Vanessa Armstrong Vixama). We review what Francois said first.
Passenger Davidson Francois testified that he is from Cap-Haitien, Haiti. In 2016, Francois left Haiti and traveled to Freeport, Bahamas. After arriving in Freeport, Francois's father told him that a trip was being planned to bring Francois to the United States so that Francois could go to school. A few months later, in November 2016, Francois boarded the defendants' boat and left Freeport with about 21 other passengers. Francois testified that it was night time when he boarded the boat and that Smith drove while Delancy "help[ed] out." After leaving Freeport, the boat got lost and spent six days at sea.
Francois expressly testified that other passengers on the boat said they were headed to the United States, and Francois likewise believed the boat was going to the United States. Francois admitted, however, that he did not personally know where the boat was heading when he left Freeport because the defendants "didn't tell [the passengers] anything." Notably though, Delancy did discourage the passengers from waving at other boats or using their cell phones.
Specifically, during those six days, Francois saw several other boats pass by. One boat stopped and provided them with bread and water, but no other boats came to their aid. But when the passengers attempted to get the attention of the other boats that were passing, Delancy told them not to wave at the other boats or attract their attention "because we don't know what kind of boats they are." Delancy also told the passengers to turn their cell phones off during the trip and that he did not want them using their phones for any reason. Some of the passengers did attempt to use their phones but were unable to get a signal at sea.
While Francois's testimony was admitted without objection, the defendants objected to the government using the videotaped deposition of passenger Vanessa Armstrong Vixama, who also was from Haiti. Vixama's testimony was strikingly similar to Francois's. Vixama traveled to Freeport, Bahamas from Haiti in April 2016. Her plan was to travel then from the Bahamas to the United States illegally, as she previously had applied for and been denied student visas to the United States on three separate occasions. A friend of Vixama's mother arranged the trip for Vixama, and Vixama's family paid $5,000 for her passage.
Late one night in November 2016, Vixama got on a boat in Freeport with 20 to 22 other people to come to the United States. Vixama testified that she believed she was going directly from Freeport to Miami, and one of the defendants told her it would be about a three-hour trip. Smith drove the boat while Delancy held a GPS device and talked to Smith.
After leaving Freeport, the boat got lost and ran out of gas. When a fishing boat passed by, the passengers pooled their money to buy gas so they could continue their trip. There was no food on the boat, and they ran out of water after the first day at sea.
Vixama and other passengers had cell phones with them on the boat and attempted to use them while the boat was lost, but could not get any signal. When Delancy noticed the lights from their phones, he told the passengers to turn their phones *1221 off when other boats were going by. Vixama guessed that this was "so that the police wouldn't see us." Initially, Delancy also told the passengers not to wave their life jackets in the air to attract the attention of other boats, but by their sixth day lost at sea, Delancy relented and the passengers used the life jackets to attract the attention of the Coast Guard cutter, which rescued them after their six days at sea with little food or water.
II. PROCEDURAL HISTORY
A. Indictment
A federal grand jury indicted both Smith and Delancy on (1) one count of conspiracy to encourage and induce an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 1); and (2) 21 counts of knowingly encouraging and inducing an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II) and 18 U.S.C. § 2 (Counts 2-22). The grand jury also charged Smith and Delancy with one count each of attempted illegal reentry, in violation of 8 U.S.C. § 1326(a), (b)(2) (Counts 23 (Delancy) and 24 (Smith)). Both defendants pled not guilty and proceeded to trial.
B. Material Witness Complaint Against Vixama
Many of the aliens on the boat were never brought into the United States, but were sent back to Haiti after being processed by the Coast Guard. However, four aliens, including Vixama and Francois, were brought into the United States to be interviewed in connection with Smith and Delancy's criminal conduct. Initially, Vixama was detained in Immigration and Customs Enforcement ("ICE") custody at the Broward Transitional Center.
In December 2016, Agent Nowicki met with Vixama while she was in immigration detention at the Broward Transitional Center. During that meeting, Vixama was anxious and provided Agent Nowicki with the phone number of her uncle, and then she called her uncle to put herself at ease. The uncle's phone number was the only U.S. contact information Vixama provided.
Subsequently, on December 22, 2016, the government filed a material witness complaint against Vixama and obtained a warrant for her arrest. On January 12, 2017, Vixama was arrested on the material witness complaint. Because she was now under arrest, Vixama was then transferred into the custody of the U.S. Marshals Service at the Federal Detention Center in Miami ("FDC Miami"). When Vixama was transferred to FDC Miami, ICE personnel within its Enforcement and Removal Operations ("ICE ERO") lodged an immigration detainer against Vixama to ensure that she would be transferred back into ICE detention for immediate deportation once the material witness complaint was dismissed as to the criminal case.
On January 19, 2017, a magistrate judge appointed attorney David Raben to represent Vixama on the material witness complaint. On January 27, 2017, and by agreement of the defendants, the government took a videotaped deposition of Vixama to preserve her testimony for trial.[1] Defendants *1222 Smith, Delancy, and their respective defense counsel were present and cross-examined Vixama.
At that time, the parties expected that after Vixama's deposition was taken two things would happen: (1) the material witness complaint would be dismissed (releasing her from the U.S. Marshals' custody at FDC Miami), and (2) ICE would then deport her back to Haiti and she would be unavailable to testify at trial. If the deposition had not been taken, then Vixama would have remained in the U.S. Marshals' criminal custody until Smith and Delancy's trial. The deposition, however, would allow Vixama to get out of the U.S. Marshals' criminal custody, and then ICE would deport her back to Haiti. Smith and Delancy never objected to the taking of Vixama's videotaped deposition. Smith and Delancy do not dispute that their counsel had a full and adequate opportunity to cross examine Vixama.
Once Vixama's videotaped deposition was completed, a magistrate judge dismissed the material witness complaint against her on February 3, 2017. At the time, Vixama was still in the U.S. Marshals' custody at FDC Miami.
C. Vixama's Release from Custody
Once the material witness complaint against Vixama was dismissed as to the criminal case, ICE ERO personnel had 48 hours to pick Vixama up and take her into detention pursuant to the immigration detainer ICE had filed against her. See 18 U.S.C. § 3144 ; 8 C.F.R. § 287.7(d). ICE ERO personnel did not pick Vixama up within the required 48-hour time period. As a result, on February 6, 2017, the U.S. Marshals released Vixama from their custody.[2]
D. Government's Multiple Attempts to Locate Vixama
On February 7, 2017, Agent Nowicki learned of Vixama's release and began his efforts to locate her. Nowicki contacted Vixama's uncle (whose number Vixama previously had provided), and he was at work. Later that night, Nowicki contacted the uncle again and obtained the uncle's address in Coral Springs, Florida. The next day, Nowicki passed on the uncle's contact information to ICE ERO personnel.
On February 21, 2017, ICE ERO agents went to the uncle's house and searched the house for Vixama, but were unable to locate her. The ICE ERO agents could not get a straight answer from the occupants of the house as to whether Vixama was staying there. The occupants of the house told the ICE ERO agents "they're not sure if [Vixama's] residing there," but the ICE ERO agents "felt like they were getting the runaround."
In March 2017, Agent Nowicki followed up with the ICE ERO agents to see if they had located Vixama but "was told by a supervisor there that they did not have the manpower to go look for her again."
On the morning of April 12, 2017, the government attempted to locate Vixama a third time. The government emailed Vixama's former counsel, David Raben, to see if he knew where Vixama was and to obtain her contact information. Specifically, the Assistant United States Attorney ("AUSA") wrote to attorney Raben:
*1223 I'm writing to see if you have a contact number or know where your former client, Vanessa Armstrong Vixama, is currently residing. It is my understanding that she was released from the custody of the US Marshalls [sic] before ICE ERO officers came to pick her up at FDC. ICE ERO officers have been unable to locate her to date. Since she hasn't been deported yet, we are working to determine if she can be located to testify at trial or if she is unavailable to testify.
Less than an hour later, attorney Raben responded: "I sent an email to family member. I never heard from client after release. Will keep you advised." The following morning, April 13, 2017, attorney Raben sent another email to the AUSA, stating: "She is in Delaware[.] She doesn't have a phone[.] I gave your contact info to her boyfriend[.]"
Later that same day, April 13, 2017, the AUSA sent a trial subpoena for Vixama to attorney Raben via email and again asked for an address or phone number as follows:
Please find attached a trial subpoena for Vanessa Armstrong Vixama. Please let me know if you have an address or phone number to reach her or know of any other means of serving this subpoena to her.
Please provide Ms. Vixama['s] contact information for the case agent, Craig Nowicki ....
The subpoena directed Vixama to appear at trial on April 19, 2017, six days later. A few minutes after the AUSA sent the trial subpoena, attorney Raben responded: "I am forwarding info to boyfriend[.]"
On April 15, 2017, the AUSA emailed attorney Raben again, indicating that if Vixama did not appear at trial on April 19, the AUSA would then seek a bench warrant for Vixama. The AUSA's April 15 email asks:
Have you heard anything back from Ms. Vixama or her boyfriend? If she doesn't appear on Wednesday, April 19th as indicated in the subpoena, we will be seeking a bench warrant.
About an hour later on April 15, attorney Raben sent the AUSA an email with the name and phone number of Vixama's boyfriend, stating: "You can call her now at this number."[3] In a separate email, attorney Raben stated: "I just emailed you her number. I believe she will cooperate." (emphasis added) From this exchange, it appeared that attorney Raben had successfully gotten the trial subpoena to Vixama through her boyfriend and that Vixama would cooperate.
Later that same day, Agent Nowicki attempted to call Vixama's boyfriend, but the call "went to an unset-up voicemail box" and Nowicki was not able to leave a message. Agent Nowicki then sent a text message to the boyfriend identifying himself as a Homeland Security agent, advising the boyfriend that Vixama was needed in Miami, and requesting that Vixama call him back. Agent Nowicki did not receive a response to this text message.
On April 17, 2017, the first day of trial, the government informed the district court that it intended to present Vixama's deposition testimony. The government explained that, after her deposition was taken, Vixama was released from the U.S. Marshals' custody and was not picked up by ICE ERO personnel to be returned to immigration detention. The government described the various steps it had taken to locate Vixama. The government stated that it still considered her to be "unavailable" because it had not been able to locate her.
*1224 In response, defendant Smith moved that Vixama be required to testify, arguing that she was "available" because she was still somewhere within the borders of the United States and was not yet deported. The district court directed the parties to file memoranda and caselaw on the admissibility of Vixama's deposition testimony.
E. Parties' Motions Regarding Admission of Vixama's Deposition
On April 18, 2017, the government filed a motion in limine to use Vixama's videotaped deposition at trial. The government argued that it had made good-faith efforts to locate Vixama and compel her attendance at trial but had been unable to do so. The government therefore asserted that Vixama should be deemed "unavailable" for trial, and her videotaped deposition should be admitted pursuant to Federal Rule of Evidence 804 and 8 U.S.C. § 1324. In the meantime, Agent Nowicki attempted to call and text Vixama's boyfriend again on April 18 but again received no response.
That same day, defendant Smith filed a motion to exclude Vixama's deposition, which defendant Delancy adopted. Smith argued that the government had not demonstrated Vixama was "unavailable" under the Federal Rules of Evidence, because it knew she was in Delaware, and had not made a reasonable, good-faith effort to ascertain her precise whereabouts.
The next day, April 19, 2017, the government asked the district court to issue a bench warrant for Vixama's arrest in light of her failure to comply with the trial subpoena. The district court issued a bench warrant but did not rule on the motions regarding the admissibility of Vixama's deposition. The bench warrant was entered into the National Criminal Information Center ("NCIC") database.
The government also sent a copy of the bench warrant to Vixama's former counsel, Raben. And Raben again attempted to contact Vixama's boyfriend but received no response. In an email on April 20 at 6:05 a.m., Raben informed the prosecutor that "I spoke to boyfriend this morning and explained consequences of her failing to contact agent."
F. Hearing on Admissibility of Vixama's Deposition
On April 20, 2017 (the fourth day of trial), after the day's testimony concluded, the district court dismissed the jury and held a hearing on the admissibility of Vixama's deposition testimony. At the hearing, Agent Nowicki testified regarding the above-described events and the government's multiple attempts to locate and contact Vixama. The government emphasized (1) that Vixama was a deportable alien, (2) that if she now contacted law enforcement (such as Agent Nowicki), she could be deported, and (3) that she had every motivation to hide from the AUSA and law enforcement and to not make herself available at trial. The government argued that it made reasonable, good-faith efforts to obtain Vixama's presence at trial. Defendants Smith and Delancy asserted that the government's efforts to locate Vixama were insufficient to establish good faith.
The district court found that Vixama was "unavailable" and that the government had made good-faith, reasonable efforts to secure her presence at trial. The district court rejected the defendants' contention that the government's efforts were "merely perfunctory" and found, based on Agent Nowicki's credible testimony, that the government's efforts to locate Vixama were reasonable under the totality of the circumstances. On April 21, 2017, Vixama's videotaped deposition was played for the jury over the defendants' objection.
*1225 G. Convictions and Sentences
The jury found both defendants guilty as charged on all counts. At sentencing, Smith had a total offense level of 25 and a criminal history category of III, resulting in an advisory guidelines range of 70 to 87 months' imprisonment. Delancy had a total offense level of 23 and a criminal history category of V, resulting in an advisory guidelines range of 84 to 105 months' imprisonment.
The district court sentenced Smith to 87-month prison sentences on Counts 1 (conspiracy) and 24 (illegal reentry) and 60-month sentences on Counts 2 through 22 (alien smuggling), all to run concurrently with each other but consecutive to Smith's revocation sentence in a separate federal case related to his prior alien smuggling conviction. The district court sentenced Delancy to 90-month sentences on Counts 1 (conspiracy) and 23 (illegal reentry) and 60-month sentences on Counts 2 through 22 (alien smuggling), all to run concurrently with each other but consecutive to Delancy's revocation sentence in a separate federal case related to his prior illegal reentry conviction.[4]
III. VIXAMA'S VIDEOTAPED DEPOSITION
A. Standard of Review
Typically, we review challenges to the district court's rulings on the admissibility of evidence for an abuse of discretion. United States v. Gari, 572 F.3d 1352, 1361 (11th Cir. 2009). But we review de novo a defendant's claim that his Sixth Amendment rights were violated. See id.; see also United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012) ("A defendant's claim that his Sixth Amendment rights were violated is reviewed de novo."); United States v. Yates, 438 F.3d 1307, 1311 (11th Cir. 2006) (en banc) ("[W]e review de novo Defendants' claim that their Sixth Amendment rights were violated."); United States v. Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000) ("We ... give plenary review to claims of constitutional error for a failure to show the unavailability of an out-of-court declarant."). Such claims, however, are subject to harmless error review. United States v. Lang, 904 F.2d 618, 625-26 (11th Cir. 1990).
Here, defendants Smith and Delancy challenge the admissibility of Vixama's videotaped deposition only on the ground that it violated their Confrontation Clause rights under the Sixth Amendment. Accordingly, we review their claim de novo.
B. Applicable Federal Rules
Before addressing the Confrontation Clause issue, we review the relevant federal rules as background.
Federal law provides for the admission at trial of a material witness's videotaped deposition testimony in alien smuggling cases if the witness has been deported. See 8 U.S.C. § 1324(d). The defendants agreed to Vixama's deposition and expected that Vixama would be deported immediately to Haiti after that deposition, meaning that her videotaped deposition would then be admissible at trial under § 1324(d). Id. ("[T]he videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation.").
Contrary to the expectations of both the defendants and the government, Vixama *1226 was not transferred by the U.S. Marshals Service to ICE, per the latter's detainer, because ICE missed the 48-hour deadline to take Vixama into custody upon dismissal of the material witness complaint. That being so, upon her release, Vixama was able to escape deportation.[5]
Because Vixama had not been deported at the time of trial, we look to Federal Rule of Criminal Procedure 15(f), which provides that a witness's deposition testimony may be used at trial if the witness is "unavailable," as determined by Federal Rule of Evidence 804. See Fed. R. Crim. P. 15(f) ("A party may use all or part of a deposition as provided by the Federal Rules of Evidence.").
In turn, Federal Rule of Evidence 804(a)(5)(A) provides that a witness is considered to be "unavailable" if, among other things, the witness is absent from the trial and the government "has not been able, by process or other reasonable means, to procure ... the declarant's attendance." Fed. R. Evid. 804(a)(5)(A). If a witness is "unavailable," the Federal Rules of Evidence do not exclude as hearsay the witness's former testimony given in a lawful deposition at which the defendant had an opportunity for cross-examination. Fed. R. Evid. 804(b)(1).
As explained below, unavailability must ordinarily also be established to satisfy the requirements of the Confrontation Clause, which we discuss next.
C. Confrontation Clause
The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Most of the time, this means that a witness must appear in person and give live testimony at trial if her statements are to be used against the defendant. See Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365, 158 L.Ed.2d 177 (2004).
The defendant's right to a witness's live testimony in the courtroom serves many important purposes, including allowing the jury to observe closely the witness's demeanor, expressions, and intonations, and thereby determine the witness's credibility. See Ohio v. Roberts, 448 U.S. 56, 63-64, 100 S. Ct. 2531, 2537-38, 65 L.Ed.2d 597 (1980), abrogated in part on other grounds by Crawford, 541 U.S. at 60-69, 124 S. Ct. at 1369-74. The Supreme Court has emphasized that in-court confrontation not only allows the defendant to test the witness's recollection, but also compels the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Id. (internal quotations omitted); see also Barber v. Page, 390 U.S. 719, 721, 88 S. Ct. 1318, 1320, 20 L.Ed.2d 255 (1968) (stating same).
Of course, the Supreme Court has also told us that the right to a witness's presence at trial is not absolute. In Crawford, the Supreme Court expressly held that the testimony of a witness who does not appear at trial is still admissible, in the constitutional sense, if these two conditions are met: (1) the witness "was unavailable to testify"; and (2) "the defendant had had a prior opportunity for cross-examination."
*1227 Crawford, 541 U.S. at 59, 124 S. Ct. at 1369. Accordingly, prior cross-examination alone cannot substitute for the defendant's right to live testimony in the courtroom unless the witness meets the Confrontation Clause's requirement of "unavailability." See id.; see also Roberts, 448 U.S. at 65, 100 S. Ct. at 2538 (noting that the "Framers' preference for face-to-face accusation" requires the proponent of recorded testimony to demonstrate unavailability of the witness, "including [in] cases where prior cross-examination has occurred."). The integrity of the fact-finding process is at stake because the Confrontation Clause is a procedural protection. Crawford, 541 U.S. at 61, 124 S. Ct. at 1370.
The parties do not dispute that the government was authorized to take Vixama's videotaped deposition, that both the defendants and their counsel were physically present during the videotaped deposition, or that the defendants' counsel had an adequate and full opportunity to cross-examine Vixama at her deposition. Her testimony was taken precisely for use at trial, given she would be deported before trial. In fact, the government's direct and redirect examination of Vixama totals approximately 32 pages, whereas the cross-examination by defense counsel, together, totals 79 pages of the deposition transcript. Defense counsel tested Vixama's testimony and credibility with sufficient cross-examination.
Therefore, the sole issue on appeal is whether Vixama was "unavailable" to testify at the time of trial.
D. "Unavailable" Witnesses
A witness is "unavailable" for purposes of the Confrontation Clause if the witness does not appear and the government has "made a good-faith effort" to obtain the witness's presence at trial. Hardy v. Cross, 565 U.S. 65, 69, 132 S. Ct. 490, 493, 181 L.Ed.2d 468 (2011) ; see also Roberts, 448 U.S. at 74, 100 S. Ct. at 2543 (examining whether the prosecution "made a good-faith effort" to obtain the witness's presence at trial (internal quotation marks omitted)); Siddiqui, 235 F.3d at 1324. Because Vixama did not appear at trial, our inquiry here narrows to whether the government made "a good-faith effort" to obtain her presence.
We do not write on a blank slate as to what constitutes "a good-faith effort." The Supreme Court has told us that whether "a good-faith effort" has been made is "a question of reasonableness." Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543 (emphasis added) (internal quotation marks omitted). Specifically, "[t]he lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." Id. at 74, 100 S. Ct. at 2543 (internal quotation marks omitted); see Hardy, 565 at 70, 132 S. Ct. at 494 (quoting same).
The Supreme Court has also held that the prosecution bears the burden to show it made a good-faith effort to produce the witness. Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543. And the " 'possibility of a refusal is not the equivalent of asking and receiving a rebuff.' " Id. at 76, 100 S. Ct. at 2544 (quoting Barber v. Page, 390 U.S. 719, 724, 88 S. Ct. 1318, 1322, 20 L.Ed.2d 255 (1968) ). A good-faith effort, however, does not require futile acts. Id. at 74, 100 S. Ct. at 2543.
Furthermore, the Supreme Court in Hardy emphasized that, "[w]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Hardy, 565 U.S. at 71-72, 132 S. Ct. at 495. The Supreme Court in Hardy also pointed out that in Roberts, "[w]e acknowledged that there were some additional steps that the prosecutor *1228 might have taken in an effort to find the witness, but we observed that '[o]ne, in hindsight, may always think of other things' " that could have been done. Id. at 70, 132 S. Ct. at 494 (quoting Roberts, 448 U.S. at 75, 100 S. Ct. at 2544 ).
Although our Circuit has little precedent in this area, we have applied Roberts's reasonableness standard before. Siddiqui, 235 F.3d at 1324 (11th Cir. 2000) (citing Roberts, 448 U.S. at 74, 100 S. Ct at 2543 and acknowledging that "[t]he lengths to which the government must go to produce a witness is a matter of reasonableness"). Siddiqui involved two foreign witnesses who resided in Japan and Switzerland and were outside of the United States at the time of the trial. See id. at 1320-21. After the depositions of both witnesses, the government sent them letters urging them to come and testify in person, but the witnesses declined to do so. Id. at 1324-25. Our Court recounted other facts in the case, such as that during their depositions, the witnesses already indicated an unwillingness to travel to attend the trial. Id. at 1324. Given all the factual circumstances, this Court concluded that the government had shown that the foreign witnesses were unavailable despite the government's good-faith efforts to obtain their presence at trial. Id.
Of course, Siddiqui involved foreign witnesses outside the United States at the time of trial. Here, we must address the different factual situation[6] of a foreign witness, like Vixama, who resides in Haiti and is a Haitian citizen, but is temporarily within the United States at the time of trial. Yet that is far from the whole story. In this case, the missing foreign witness Vixama (1) has no cell phone or address in the United States, (2) is illegally here, and (3) has absconded from the jurisdiction of the trial court in Florida to avoid detention and immediate deportation to Haiti. Although the government successfully sent a trial subpoena to the witness Vixama, through her former attorney and her boyfriend, and her former attorney reported back to the government that she would cooperate, Vixama still refused to appear at trial.
We are unaware of a similar factual case, but we do know from the Supreme Court that there is no brightline rule for reasonableness, and that a reasonableness inquiry necessarily is fact-specific and examines the totality of the factual circumstances of each particular case. See, e.g., Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (basing its reasonableness determination on all the "facts presented"); United States v. Banks, 540 U.S. 31, 36, 124 S. Ct. 521, 525, 157 L.Ed.2d 343 (2003) (treating "reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case"); Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L.Ed.2d 347 (1996) (eschewing "bright-line rules," emphasizing "the fact-specific nature of the reasonableness inquiry," and instructing courts to examine "the totality of the circumstances"); Ker v. California, 374 U.S. 23, 33, 83 S. Ct. 1623, 1629-30, 10 L.Ed.2d 726 (1963) (emphasizing "there is no formula for the determination of reasonableness" and "[e]ach case is to be decided on its own facts and circumstances" (internal quotation marks and alterations omitted)).[7]
*1229 Therefore, our task is to examine the government's cumulative efforts here to determine if the district court correctly decided that the government made a good-faith, reasonable effort to obtain Vixama's presence at trial.
E. Discussion
Given the specific facts of this case recounted at length above, we are convinced that the district court did not err in admitting Vixama's videotaped deposition testimony.
We start with how Agent Nowicki attempted to locate Vixama multiple times. Immediately after learning of Vixama's release on February 6, 2017, Agent Nowicki on February 7 contacted her uncle, whose name and phone number Vixama had previously provided. During Agent Nowicki's two efforts to contact the uncle, he was successful in obtaining the uncle's address. After doing that, Agent Nowicki requested that ICE ERO agents visit the uncle's house to look for Vixama.
The ICE ERO agents then did that on February 21, 2017. They even searched the house, but were unable to locate Vixama and found her relatives to be uncooperative. And after the ICE ERO agents failed to locate Vixama at the uncle's house, Agent Nowicki followed up with them again about Vixama in March 2017. Ultimately, Agent Nowicki was told ICE ERO did not have the manpower to look for her again at that time.
Importantly, at this juncture, Vixama had given her deposition, the material witness complaint had been dismissed, and Agent Nowicki had no basis to take her into custody. Significantly, though, there was still an immigration detainer against Vixama. It was plainly reasonable for Agent Nowicki to turn initially to ICE for help in locating Vixama.
Even so, the government's efforts to locate Vixama did not stop. In the week leading up to the April trial, the government continued its efforts to locate Vixama by reaching out to her former counsel Raben four times, issuing a trial subpoena, and thrice attempting to communicate with Vixama using her boyfriend's cell phone number. It was patently reasonable for the government to contact Raben, as Vixama's former counsel, to try to locate her. Raben had represented Vixama regarding the material witness complaint against her in this very case. As such, Raben had an established relationship with Vixama and access to her in a way that the government did not. And Vixama had no address or cell phone.
Moreover, the government's efforts through attorney Raben did not fall on deaf ears. As evidenced by the email communications recounted above, former counsel Raben advised the government that although Vixama did not have a *1230 phone number, he was forwarding the government's communications, and later the trial subpoena, to Vixama through her boyfriend. The government thus made good progress as the government had gotten Vixama's former counsel to send her the subpoena. Subsequently, on April 15, Raben even advised that he believed Vixama "will cooperate." Given how little information the government had and how promptly and helpfully Raben contacted her boyfriend and responded, it was also reasonable for the government to rely on these efforts through Vixama's former lawyer.
Further, given that Raben had represented Vixama as to the material witness complaint, it was also reasonable to rely on her former attorney's assessment and representation that she "will cooperate." When Vixama did not appear the third day of trial on April 19, the government obtained a bench warrant and also sent it to her former attorney, once again in an effort to secure her presence at trial. Her attorney then tried to contact the boyfriend again (who had been responsive to Raben about the trial subpoena). But this time, the boyfriend did not respond to even attorney Raben.
We also cannot ignore Vixama's obvious determination to go into hiding and to elude capture. She had three times before failed to obtain a visa to the United States, which led to her attempt to sneak to the United States via the defendants' illegal smuggling scheme. Then, when she was mistakenly released, she immediately capitalized on that mistake by absconding and fleeing from the jurisdiction of the trial court in Florida. While her boyfriend was reportedly in Delaware and initially cooperative with Vixama's former lawyer, he then stopped responding to calls or texts to his cell phone. Given these undisputed circumstances, it was reasonable for the government to try to locate Vixama through her former lawyer, which is confirmed by the facts that the lawyer quickly and helpfully responded to the government and then successfully sent the trial subpoena to Vixama through her boyfriend. And once Vixama failed to appear at trial, it was also reasonable for the government to send the bench warrant to her former lawyer in an effort to obtain her presence.
Simply put, the Confrontation Clause does not require the government to make every conceivable effort to locate a witness; it requires only a good-faith effort that is reasonable under all of the circumstances of the case. See Hardy, 565 U.S. at 69-70, 132 S. Ct. at 493-94 ; Roberts, 448 U.S. at 74-76, 100 S. Ct. at 2543-44. As the Supreme Court has told us, "[o]ne, in hindsight, may always think of other things." Roberts, 448 U.S. at 75, 100 S. Ct. at 2544. "[G]reat improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." Id. at 75-76, 100 S. Ct. at 2544 ; see also Hardy, 565 U.S. at 70-72, 132 S. Ct. at 494-95.[8] That epitomizes this case.
At bottom, a reasonable, good-faith effort is case-specific and contextually driven. Vixama had no phone or address, had absconded outside the State of Florida, was in hiding, and had a strong incentive not to be found. The government had extremely *1231 limited information regarding her whereabouts, but yet the government succeeded in having the trial subpoena sent to her through her former attorney and boyfriend. While the government's multiple efforts and pursuit of different ways to locate Vixama-first at her uncle's house, then through her former attorney, and finally through her boyfriend-were unavailing, they constituted a good-faith effort that was reasonable under the factual circumstances of this case.
Accordingly, we affirm the district court's admission of Vixama's videotaped deposition at trial. See Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (affirming the admissibility of prior recorded testimony of a witness outside the state where the prosecutor sent subpoenas to the home address of the witness's parents although the prosecutor knew the witness was not there and the parents had no way to reach her); United States v. Thomas, 705 F.2d 709, 711-12 (4th Cir. 1983) (affirming the admissibility of prior recorded testimony where the two witnesses vanished and the government attempted in vain to locate them).
IV. PROSECUTORIAL MISCONDUCT
Smith also argues that the prosecutor made inappropriate comments during closing argument. We review this prosecutorial misconduct claim de novo. See United States v. Sosa, 777 F.3d 1279, 1294 (11th Cir. 2015).
A. Prosecutor's Statements During Closing Argument
Prior to trial, the government noticed its intent to introduce, under Federal Rule of Evidence 404(b), Smith's prior 2013 conviction for alien smuggling. The notice explained that Smith pled guilty in June 2013 to a single count of alien smuggling for profit, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and argued this prior conviction was relevant to establish, among other things, Smith's knowledge, intent, and lack of mistake in the present case. Smith responded that the district court should not allow the government to introduce his prior conviction, but the district court ultimately allowed the government to admit the first page of the judgment from Smith's prior conviction at trial.[9] The judgment indicated that Smith's prior case was prosecuted in the West Palm Beach division of the Southern District of Florida.
During closing arguments, Smith's counsel argued that a true alien smuggler likely would take the most direct route from the Bahamas to the United States to avoid detection by law enforcement on the open seas. That route, counsel asserted, would be the one directly west from Freeport, Bahamas to Boynton Beach, Florida. Counsel noted that was not the route Smith took and contended that Smith's explanation that he was going to Bimini made the most sense given where his boat ultimately ended up.
In rebuttal, the government pointed to the fact that Smith's prior conviction occurred in West Palm Beach (which is near Boynton Beach) to explain why the defendants chose not to take the most direct route from the Bahamas to Florida. Smith's counsel objected and reserved a motion for mistrial. The district court overruled Smith's objection, and the government continued its argument, stating:
It's not an accident that they're down south of Bimini as opposed to going straight across. When you bring 21 *1232 aliens into the United States, you don't come into a marina, a port, a harbor. You're smuggling these aliens into the country illegally. So ... to go down south away from where you're last caught, it's not an accident or mistake. You're trying to get in undetected.
After the government concluded its rebuttal, Smith moved for a mistrial based on the government's comments. Smith contended that it was inappropriate for the government to argue that his prior conviction occurred in West Palm Beach simply because the judgment came from the West Palm Beach division. Smith explained that the Southern District of Florida extends from Key West to Fort Pierce, and activity that occurs in one division within the district may be indicted in a different division. Smith asserted that it was "extremely misleading" to say his prior offense was committed in West Palm Beach.
The government responded that the case number for Smith's prior conviction also indicated the case originated in West Palm Beach. The government further asserted that Smith opened the door with his argument that smugglers would take the most direct route between the Bahamas and Florida.
The district court denied Smith's motion for a mistrial, finding the government's statement that the prior conviction occurred in West Palm Beach was accurate and not misleading. The district court further determined that Smith opened the door by emphasizing that it made no sense for Smith not to take the shortest route, and the government's argument in response to that point was fair.
B. Discussion
To show prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) the remarks prejudicially affected his substantial rights. United States v. Sosa, 777 F.3d 1279, 1294 (11th Cir. 2015). A defendant's substantial rights are prejudicially affected when there is a reasonable probability that, absent the remarks, the outcome of the trial would have been different. Id.
The prosecutor's comments during closing argument must be viewed in the context of the trial as a whole. United States v. Reeves, 742 F.3d 487, 505 (11th Cir. 2014). Though the prosecutor may not exceed the evidence presented at trial in closing arguments, he may state conclusions drawn from the evidence. Id. The prosecutor is also entitled to make a fair response to defense counsel's arguments, and issues raised by the defendant in his closing argument are fair game for the prosecution on rebuttal. Id.
Here, the district court did not err in denying Smith's motion for a mistrial based on the prosecutor's comments about Smith's prior conviction during closing arguments. The prosecutor's statement that Smith's prior alien smuggling conviction occurred in West Palm Beach was accurate-the judgment of that conviction, which was admitted into evidence at trial, indicates that it was entered in the West Palm Beach division of the Southern District of Florida. And as the district court noted, the prosecutor's remarks were made in direct response to Smith's argument during his closing that it would make no sense for an alien smuggler not to take the most direct route from the Bahamas to Florida. Given that argument by Smith, it was not unfair for the prosecutor to point out, as a potential motive for taking a different route, that Smith's prior conviction occurred in the same area where the most direct route would lead. See id. at 505.
Even assuming arguendo that Smith showed the prosecutor's comments *1233 were improper, his claim still fails because the comments did not affect his substantial rights. Sosa, 777 F.3d at 1294. Ample evidence at trial supported the jury's verdict that Smith was engaged in alien smuggling. Francois and Vixama both testified that the boat left Freeport late at night, under cover of darkness; that they believed they were traveling to the United States; and that the defendants instructed them not to draw attention to their boat while they were lost at sea. Vixama also testified that her family paid $5,000 for her passage to Miami. The Coast Guard witnesses testified that Smith's story-that he was traveling to Bimini-was suspicious, given the location in which the boat was found and the direction of the currents in that area. And both the CBP pilot and Agent Nowicki testified that alien smugglers do not always take a direct route and often take evasive actions to disguise their activities. There is not a reasonable probability that, but for the prosecutor's comment on rebuttal, the jury would have found Smith not guilty. Id. at 1294.[10]
V. CUMULATIVE ERROR
Under the cumulative error doctrine, an aggregation of otherwise nonreversible errors can warrant reversal where the combined effect of the errors denied the defendant his constitutional right to a fair trial. See United States v. Mosquera, 886 F.3d 1032, 1052 (11th Cir. 2018). But "where there is no error or only a single error, there can be no cumulative error." United States v. King, 751 F.3d 1268, 1277-78 (11th Cir. 2014) (internal quotations omitted).
Here, as explained above, the district court committed no error. Smith's claim of cumulative error therefore lacks merit.[11] Id.
VI. RESPONSE TO DISSENT ABOUT VIXAMA'S DEPOSITION
Our colleague concurs in our majority opinion except as to the admission of Vixama's videotaped deposition. The dissent does not dispute that (1) the defendant's counsel, with the defendants present, had a full opportunity to cross-examine Vixama during her videotaped deposition, (2) that Vixama's deposition is admissible if she was unavailable, and (3) that a witness is unavailable if she does not appear at trial and if the government demonstrates it made a good-faith, reasonable effort to obtain her presence. The dissent parts company, however, with the majority opinion's affirmance of the district court's admission of Vixama's videotaped deposition based on its determination that the government made a good-faith, reasonable effort to obtain Vixama's presence at trial but she failed to appear.
We respond to the dissent's 43-page criticism of this portion of our majority opinion, in three parts below: (1) why the dissent's claim-that the majority opinion "does not heed the lessons of Hardy and Roberts"-is just flat wrong; (2) why the dissent's analysis of what constitutes a good-faith, reasonable effort is flawed in multiple ways; and (3) why the four decisions of other circuits, discussed by the dissent, demonstrate the fact-specific nature of the reasonableness inquiry and why the majority opinion properly applies the reasonableness standard to the facts of this case.
*1234 A. Lessons of Roberts and Hardy
We start with the dissent's accusations that our majority opinion "does not heed the lessons of Hardy and Roberts," and "completely misses th[e] lesson from Hardy and Roberts." Dissenting Op. at 1259, 1259-60. Because the dissent cherry picks a phrase or two from those decisions out of context, those two Supreme Court decisions warrant a full discussion. These decisions actually support the majority opinion. In fact, in both Roberts and Hardy, the Supreme Court upheld the trial court's admission of prior recorded testimony of a witness who did not appear at a criminal trial, just as we do here in upholding the district court's admission of the prior recorded testimony of Vixama, who likewise did not appear at trial.
More specifically, in Ohio v. Roberts, the Supreme Court upheld the trial court's decision to admit the preliminary hearing testimony of a key witness, Anita, who did not appear at trial. See 448 U.S. at 60, 77, 100 S. Ct. at 2536, 2545. Between November 1975 and March 1976, the criminal case was set and reset for trial four times with repeated continuances leading to new trial dates. Id. at 59, 100 S. Ct. at 2535. Each time, the government sent trial subpoenas to the witness, Anita, at her parents' Ohio address, resulting in five subpoenas sent there. Id. Although the government knew the witness (Anita) had not been at that residence for a long time, her parents' home was her "last-known real address." Id. at 59, 76, 100 S. Ct. at 2535, 2544.
After the preliminary hearing on January 10, 1975, Anita had left for Arizona, and, a year before trial, a San Francisco social worker communicated with the parents about Anita's welfare application. Id. at 59-60, 100 S. Ct. at 2535-36. After that time, though, the witness had called her parents only once and had not been in touch with her siblings. Id. During that last phone call, which occurred about seven or eight months before trial, the witness Anita told her parents that she "was traveling" outside Ohio, but she did not advise them of where she was. Id. The witness's mother attested that she knew of no way to reach the witness, even in case of emergency, and that she did not "know of anybody who knows where she is." Id. (citation and internal quotation marks omitted).
In holding the preliminary hearing testimony was admissible, the Supreme Court stressed that "[g]iven these facts, the prosecution did not breach its duty of good-faith effort." Id. at 75, 100 S. Ct. at 2544. The Supreme Court emphasized that, "[t]o be sure, the prosecutor might have tried to locate by telephone the San Francisco social worker with whom [Anita's mother] had spoken many months before and might have undertaken other steps in an effort to find Anita." Id. The Supreme Court reasoned that "[one], in hindsight, may always think of other things" to do. Id. But the Supreme Court noted that the prosecutor had sent multiple subpoenas to Anita's "last-known real address" and "had no clear indication, if any at all, of Anita's whereabouts." Id. at 76, 100 S. Ct. at 2544. Her last known address, of course, was her parents address in Ohio, where the witness had not been since the preliminary hearing in January 1975, some 14 months before the trial. See id. at 59-60, 76, 100 S. Ct. at 2535-36, 2544.
For sure, Roberts is not on all fours with this case. Nonetheless, it teaches that the prosecutor is not required to pursue every lead or step in order to be deemed to have acted reasonably. Importantly, Roberts illustrates that reasonableness depends on the particular facts of each case and makes clear that it is not our job to second guess, in hindsight, the prosecutor's efforts. Plus, Roberts upheld the admission of the prior preliminary hearing *1235 testimony where the government's efforts were arguably far less than those here. All the prosecutor did in Roberts was send a subpoena to Anita's parent's address each of the multiple times the case was reset. See id. at 59, 75, 100 S. Ct. at 2535, 2544.
The dissent also relies heavily on Hardy v. Cross, but there again the Supreme Court upheld the state trial court's admission of a victim's prior testimony when she did not appear at trial. 565 U.S. at 70-72, 132 S. Ct. at 494-95.[12] In Hardy, the defendant was charged with the kidnapping and sexual assault of victim A.S. Id. at 66, 132 S. Ct. at 491. A.S. testified and was cross-examined at Cross's first trial, which ended in his acquittal on the kidnapping charge and a mistrial on the sexual assault charges. Id.
Victim A.S. initially indicated that she was willing to testify again at the retrial, and the prosecutor "remained in constant contact with A.S. and her mother" leading up to the retrial. Id. at 66, 132 S. Ct. at 492 (internal quotation marks omitted). However, before the retrial, A.S.'s mother and brother informed the state's investigator that they did not know where A.S. was, and A.S.'s mother stated that A.S. was afraid to testify again. Id. The investigator later spoke to A.S.'s father, who did not know where A.S. was. Id. at 66-67, 132 S. Ct. at 492. Thereafter, the state undertook various efforts to locate A.S., including keeping in contact with her family members, visiting A.S.'s last known address (her mother's house), and conducting checks with various government agencies. Id. at 67-68, 132 S. Ct. at 492-93. On a final visit to the mother's house on the day before the retrial, A.S.'s mother told police that A.S. had called two weeks earlier and said she did not want to testify and would not return to Chicago for the retrial. Id. at 68, 132 S. Ct. at 493. A.S.'s mother also told police she did not know where A.S. was or how to reach her. Id.
The state trial court admitted A.S.'s prior testimony at Cross's retrial. Id. at 68-69, 132 S. Ct. at 493. Cross was convicted of sexual assault. Id. Affirming, the Illinois Court of Appeals agreed with the trial court that A.S. was unavailable and that the state made a good-faith effort to locate her. Id. at 69, 132 S. Ct. at 493. The Illinois Court of Appeals agreed A.S. was unavailable because "[i]t is clear from her telephone conversation with her mother that she was not in the city" and "also evident that she was in hiding and did not want to be located." Id. at 69, 132 S. Ct. at 493 (internal quotation marks omitted).
Cross then filed a federal habeas corpus petition, arguing in part that the admission of A.S.'s prior testimony violated his Confrontation Clause rights. Id. After the district court denied Cross's petition, the Seventh Circuit reversed. Id. The Seventh Circuit faulted the prosecutor for failing to contact A.S.'s current boyfriend or her other friends in the Chicago area, for not contacting the cosmetology school where A.S. was once enrolled, and for neglecting to even serve A.S. with a subpoena after she expressed fear about testifying at the retrial. Id. at 70-71, 132 S. Ct. at 494-95.
In reversing the Seventh Circuit in Hardy, the Supreme Court concluded that the Illinois Court of Appeals' holding-that the state had made a good-faith effort to locate A.S. and that the trial court did not err in *1236 admitting her testimony-was not an unreasonable application of Confrontation Clause precedent. Id. at 70-72, 132 S. Ct. at 494-95. The Supreme Court remarked that "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence," but emphasized that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Id. at 71-72, 132 S. Ct. at 495 (citation omitted). The Supreme Court noted that the record did not show that A.S.'s family members or the other person interviewed "provided any reason to believe" that they had information about A.S.'s whereabouts and there was "no reason to believe" that the cosmetology school had better information about A.S.'s location that did her family members. Id. at 71, 132 S. Ct. at 494. As to the lack of a subpoena, the Supreme Court stressed also that "[w]e have never held that the prosecution must have issued a subpoena if it wishes to prove that a witness who goes into hiding is unavailable for Confrontation Clause purposes." Id. at 71, 132 S. Ct. at 494 (emphasis added).
The dissent lifts this phrase-"reason to believe"-from Hardy out of context and remolds that dicta into her proposed legal or per se rule: that the government does not make a good-faith, reasonable effort as a matter of law unless it, in effect, pursues each and every lead it has "reason to believe" might assist in locating a missing witness. See Dissenting Op. at 1248, 1248-49, 1250, 1251, 1251-53, 1254, 1257, 1258-59, 1259-60, 1261, 1263-64. Having crafted that rule, the dissent argues that because database searches are easy, the government was required to take the additional investigatory step of searching databases in an attempt to discover the boyfriend's address in Delaware. Then, on top of that, the dissent surmises that if the government had used databases, it might have found an address for the boyfriend in Delaware, and then it might have found Vixama. The dissent argues a "database search ... stood a decent chance of leading the prosecution straight to the boyfriend-and likely, to Vixama." Dissenting Op. at 1245.
In short, because the government did not attempt to find the boyfriend's address through a database search, the dissent argues its efforts were unreasonable as a matter of law. To be clear, the record contains no evidence that the boyfriend ever had an address in Delaware or that a database search would have revealed an address for him in Delaware. No matter, we will nonetheless respond to the dissent's arguments that a database search might have revealed an address for the boyfriend in Delaware and, thus, the government's lack of a database search made its other efforts unreasonable as a matter of law.
Four responses. First, and most telling, is that the Supreme Court in Hardy upheld the admission of the prior testimony and actually reversed the Seventh Circuit's conclusion that the prosecutor was required to take the additional investigatory steps identified by the Seventh Circuit. One of those steps included failing to contact A.S.'s current boyfriend or her friends in the Chicago area. Second, the Supreme Court did so even though the government had not served, or even attempted to serve, the witness A.S. with a trial subpoena in Hardy.
Third, here the prosecutor did follow up on the boyfriend lead and contacted the boyfriend through Vixama's former attorney (as opposed to using databases). Through Vixama's former attorney, the government successfully sent the trial subpoena to the boyfriend, who was reportedly with Vixama, and then the government *1237 heard back that Vixama "will cooperate."[13] Fourth, as explained below, the dissent's conclusion that the government made an unreasonable effort as to the boyfriend amounts to Monday-morning quarterbacking of the prosecutor and Agent Nowicki's efforts in hindsight in favor of the dissent's preference for how they should do their jobs. Clearly, this is not a case where the government took no action when presented with a new lead.
In short, in both Roberts and Hardy, the Supreme Court upheld the trial court's admission of prior recorded testimony of a witness who did not appear at a criminal trial. It is our majority opinion-upholding the admission of Vixama's videotaped deposition testimony-that comports with the Supreme Court's decisions in Roberts and Hardy, not the dissent.
B. Dissent's Flawed Analysis of What Constitutes a Good-Faith, Reasonable Effort
The dissent's analysis too narrowly constricts the type of efforts that may qualify as a good-faith, reasonable effort in a Confrontation Clause case. For example, instead of crediting his efforts, the dissent chastises Agent Nowicki for not personally going to the home of Vixama's uncle in Coral Springs, Florida to look for her and for requesting the assistance of ICE ERO in Miami. Certainly, Agent Nowicki and the prosecutor, not ICE, had the responsibility to produce their own witnesses at trial. But that does not mean Agent Nowicki should not have sought the help of ICE ERO in doing so. (In fact, had Agent Nowicki neglected to contact ICE ERO, we have little doubt that the dissent would now add this omission to her list of fault-finding.) The dissent ignores that the material witness complaint was dismissed after the deposition, that Vixama had committed no crime, and that Agent Nowicki had no warrant to take her back into custody. Instead, it was only ICE that held a detainer. Although the dissent apparently disagrees, we think it was plainly reasonable for Agent Nowicki to ask ICE to help locate Vixama, given that the detainer allowed ICE to take her back into custody. Agent Nowicki sought ICE's assistance not once, but twice. ICE assisted Agent Nowicki the first time, but, through no fault of Agent Nowicki, said it lacked manpower to go back to the uncle's house a second time.[14]
Further, instead of crediting the prosecution's successful efforts in getting the trial subpoena to Vixama, the dissent excoriates Agent Nowicki and the prosecutor for not finding the boyfriend's address in Delaware and for calling him only twice. Repeated ten times, the dissent's mantra is "find the boyfriend's address in Delaware, find Vixama." Dissenting Op. at 1245, 1251-52, 1252, 1252-53, 1253, 1255, 1255-56, 1257, 1260, 1263-64.
The dissent's rhetorical flourish ignores the facts and reality of this case. First, similar efforts had already failed in Florida. Indeed, "find the uncle's address, find Vixama" had entirely failed. When Agent Nowicki on February 7 learned of Vixama's release on February 6, her uncle in Florida was a promising lead to find Vixama because before her mistaken release, Vixama personally had given Agent Nowicki *1238 her uncle's telephone number. As noted earlier, Agent Nowicki then worked to find an address for Vixama's uncle in Coral Springs and then successfully secured the assistance of ICE ERO in going to the uncle's house to locate Vixama. But despite that good lead in the local Florida jurisdiction, ICE ERO on February 21 searched the uncle's home and looked for Vixama, to no avail given her relatives' lack of cooperation. Given that failed outcome in Florida, it is unclear why Agent Nowicki would think that even if he got lucky and found the boyfriend's address in Delaware, the latter would reveal Vixama's whereabouts and help ICE snatch and jail her in Delaware.
In fact, let's unpack the multiple investigatory steps necessarily underlying the dissent's mantra of: "find the boyfriend's address in Delaware, find Vixama." Attorney Raben first sent the boyfriend's name and telephone number to the prosecutor on Saturday, April 15. The trial began on Monday, April 17. By 1 p.m. on Friday, April 21, both the government and the defense had rested.[15] Even if we accept that a database search might have revealed a street address for the boyfriend in Delaware, the government would still have faced other investigatory hurdles under the particular facts of this case. Miami federal officials would have had to secure the ready help of either their federal HSI counterparts, or state law enforcement, in Delaware to attempt to find the boyfriend at that street address. The federal HSI agents, or state law enforcement, in Delaware would then have had to get lucky and actually find the boyfriend at that address, and then persuade him to reveal Vixama's whereabouts so they could more formally serve the trial subpoena on Vixama. Assuming that the boyfriend would help them find the girlfriend he had presumably been hiding, ICE ERO, which had the detainer, would have to be on the spot at just the right moment to grab her, else Vixama would once again go on the run. (Vixama had not yet failed to appear at the trial for the bench warrant to issue.) The reality is that the dissent's mantra sounds easy until one actually goes step-by-step through this process that the dissent says is mandated by her reasonableness standard as a matter of law.[16]
Contrary to the dissent's touted tactics, the government used the boyfriend lead in a different, more strategic way. The government tried to work with the boyfriend through Vixama's former lawyer to get the trial subpoena to Vixama and tried to have her cooperate. The government successfully did so and, right before trial, the former lawyer even reported back on April 15 that she "will cooperate."[17]
*1239 Getting the trial subpoena to Vixama through her boyfriend and former lawyer was not a meaningless effort, as the dissent would have it, but was a significant, reasonable effort given that the boyfriend appeared to be voluntarily communicating on Vixama's behalf with her former lawyer. Because it appeared that the boyfriend (and Vixama through him) was cooperating with attorney Raben, it was reasonable for the government to rely on attorney Raben to communicate with him rather than to try to track the boyfriend down independently through databases and try to persuade him to help federal law enforcement take Vixama into ICE custody in Delaware and transfer her to Miami for trial. Pursuing the boyfriend and Vixama through her former lawyer, who had represented her in the same matter, had every indication at the time of being more fruitful than the "search and lock-her-up" maneuvers advocated by the dissent with the benefit of hindsight. Given the record as a whole and all the investigatory steps that had to succeed to capture her in Delaware on the immigration detainer (before the bench warrant issued on April 19), the government has shown that its working through her former attorney before the trial was a good-faith, reasonable effort to get the trial subpoena to her and to secure her presence at the trial.
Another flaw in the dissent's critique is the contradictory treatment of the boyfriend. On one hand, the dissent advocates that the boyfriend was key to locating Vixama. But on the other hand, the dissent complains that the trial subpoena was emailed to the boyfriend, who apparently could not be trusted to give the document to Vixama (but who could be trusted to hand Vixama over to the police), instead of serving the subpoena on Vixama, whose whereabouts were unknown. Specifically, the dissent complains that the government's communication of the trial subpoena to Vixama's former lawyer and then to her boyfriend "is not 'service' under the Federal Rules of Criminal Procedure." Dissenting Op. at 1253. Admittedly, the government's efforts did not succeed in having Vixama appear at trial, but we cannot conclude they were unreasonable. Indeed, the dissent does not seem to contest that Vixama actually received the trial subpoena through the government's efforts in contacting her former lawyer or that, given the trial subpoena, the district court *1240 properly issued a bench warrant when Vixama failed to appear on April 19 during the trial.
While the dissent presumably would have taken different actions had the dissent been the case agent or the prosecutor in this case, the Sixth Amendment does not require the prosecution to exhaust every possible means of producing a witness at trial, and in hindsight it is also possible to think of "additional steps" the prosecutor might have taken. See Roberts, 448 U.S. at 75-76, 100 S. Ct. at 2544 ; see also Hardy, 565 U.S. at 71-72, 132 S. Ct. at 495. Our role is not to Monday-morning quarterback, but instead to assess whether the agent's and the prosecutor's actions constituted good-faith efforts that fell within a zone of reasonableness. We conclude that the government's actions met this test.
Still another flaw in the dissent's critique is its isolation of the actions of Agent Nowicki and the prosecutor, without considering their efforts cumulatively. The dissent contends the government's efforts were unreasonable because Agent Nowicki considered the fact that Vixama's videotaped deposition was already taken. While the Agent candidly admitted he considered that fact, he also testified that he took other steps outlined above and, ultimately, he weighed multiple other factors, including that: (1) she had received a subpoena (through her boyfriend), (2) he had attempted to contact her boyfriend on several occasions, (3) she was in the country illegally, (4) there was no longer a criminal action against her for the Agent to take her into criminal custody, and (5) ICE was the only agency who could take her into custody before she failed to appear at trial.[18] We reject the dissent's position that the government's cumulative efforts become unreasonable simply because the case agent considers, as one factor in his continued efforts, that a videotaped deposition is available.
In fact, neither the case agent, nor the prosecutor, nor this Court is required to pretend Vixama was never deposed for the express purpose of having her deposition presented at trial as allowed for deported aliens under 8 U.S.C. § 1324(d). This was not testimony presented at a preliminary hearing or on the off-chance the witness might become unavailable later. Rather, the defendants' counsel cross-examined Vixama as if she were testifying at trial because everyone assumed this would be *1241 her testimony at trial. For sure, the defendants have not waived their Confrontation Clause claims, and prior cross-examination alone cannot substitute for the government's burden to establish a witness is unavailable. See Crawford, 541 U.S. at 59, 124 S. Ct. at 1369. But the entire factual context here is relevant and important.
The dissent segregates one-by-one the facts used in our analysis and contends we are using that one fact to somehow "excuse" or "relieve" the government of its obligation to make reasonable efforts to secure Vixama's presence at trial. See, e.g., Dissenting Op. at 1254-62. Nothing could be further from the truth. We have taken great pains to emphasize there are no brightline or per se rules when evaluating the government's good-faith efforts. Lest there be any confusion, we reiterate that we reach our conclusion that the government's efforts here were reasonable only after considering all of the particular circumstances of this case together-that is, in their totality or cumulatively.
In sum, our majority opinion faithfully follows that fact-bound reasonableness standard, as it must. And given the totality of the circumstances here, the government has demonstrated that it made good-faith, reasonable efforts to obtain Vixama's presence at trial.[19] We readily agree with the district court in Miami, who carefully considered the case, conducted a hearing outside the presence of the jury, and found that Vixama was "unavailable" before admitting Vixama's videotaped deposition on the last day of the trial.[20]
C. Dissent's Citations to our Sister Circuits
The dissent cites four decisions from our sister circuits. We take the time and space to set forth in great detail the facts of *1242 those decisions because an awareness of those facts negates the dissent's reliance on these cases for her argument that the district court erred in admitting Vixama's videotaped deposition.
The dissent cites Cook v. McKune, where the defendant Cook, convicted of first-degree murder, received a sentence of life without parole. Cook, 323 F.3d at 828. These six facts were important to the Tenth Circuit's reversal in Cook: (1) the trial court had admitted the preliminary hearing testimony of the missing witness Rudell; (2) Rudell was the only witness to testify that Cook committed the murder; (3) though a trial subpoena was issued, no attempt was ever made to serve process on, or even send the subpoena to, Rudell; (4) Rudell had been granted immunity in exchange for his cooperation, and thus the Court said he had a special reason to favor the prosecution; (5) Cook had not had an adequate opportunity to cross-examine Rudell at the preliminary hearing; and (6) Rudell lived on social security, which is how the government originally tracked him down for the preliminary hearing, but the government made no effort to locate him (through Social Security records or otherwise) to appear at trial. Id. at 826-28, 832, 834-37, 840.
In light of these highly specific facts, the Tenth Circuit concluded the government's "feeble exertions" could not "be called a good-faith effort." Id. at 840. Obviously, the facts in this case in no way resemble the facts in Cook.
Without setting forth any of its facts, the dissent also cites McCandless v. Vaughn, another first-degree murder, life sentence case, where the government also used the preliminary hearing testimony of Barth, the only eyewitness to the murder, at trial. 172 F.3d at 258-59. Witness Barth, arrested in connection with the murder, agreed to serve as a cooperating witness in exchange for (1) being released on bail and (2) having the charges against him dropped at the successful conclusion of that case. Id. After testifying at the preliminary hearing and being released on bail, Barth was rearrested twice for failing to appear, but the government did not seek to adjust the terms of his bail. Id. at 267-68. Barth was released again, and Barth failed to appear at trial. Id. at 268. The government did not contact Barth's father, who had served as the surety for Barth's bail. Id. at 268-69. The Third Circuit concluded that, given the seriousness of the murder charges, Barth's crucial importance as the only eyewitness to the murder, and his lack of impartiality, defendant McCandless had a very strong interest in confronting Barth at trial, and thus the government's efforts were insufficient. See id. at 266-70.
Unlike the witnesses in Cook and McCandless, the witness Vixama did not receive any consideration from the government for her testimony. Just the opposite. Vixama was to be deported back to Haiti, after having tried unsuccessfully to come here three times before. Also notable is the fact that this case did not involve a preliminary hearing, as in Cook and McCandless, but instead here the defendants themselves and their counsel were all physically present at the videotaped deposition, which all expected to be admitted at trial and where defense counsel thoroughly cross-examined Vixama.
Also unlike Cook and McCandless, this is not an only-witness-to-a-murder case. Apart from Vixama's deposition testimony, there was compelling evidence that the defendants' boat was headed to the United States. The boat was 24 miles from Key Largo, Florida when found. The witness Francois (also on the boat) testified that (1) his father told him a trip was being planned to bring him to the United States, (2) other passengers told him the boat was *1243 headed to the United States, and (3) Francois likewise believed the boat was going to the United States. When the boat was adrift and out of food and fuel for six days, the defendants told the passengers not to use their cell phones and not to wave at other boats passing by. The prior criminal convictions of defendants Delancy (prior illegal reentry into the United States) and Smith (prior alien smuggling into the United States) were even introduced before the jury without any objection. Certainly, Vixama's testimony corroborated Francois's testimony that he believed the boat was headed to the United States, but Francois's testimony was direct and noncontradictory as well, with ample circumstantial evidence corroborating his testimony.
Without setting forth its facts, the dissent also cites United States v. Lynch, where the defendant was convicted of second-degree murder. Similar to Cook and McCandless, the district court admitted the preliminary hearing testimony of missing witness Brown, the only eyewitness to identify defendant Lynch as the shooter. 499 F.2d at 1014, 1020-21. During the trial, a detective attempted to locate Brown at a friend's apartment, but no one answered the door. Id. at 1023. Detectives returned to the apartment the following day, but did not find Brown. Id. It was later discovered that Brown had been in the friend's apartment when the first detective knocked on the door, had stayed that night, and had left before the second set of detectives arrived the next morning. Id. at 1023-24. The D.C. Circuit concluded that the government's efforts were insufficient, pointing out (1) that a preliminary hearing is less likely to produce extensive cross-examination and impeachment of a witness than a trial,[21] and (2) that the missing witness was still within the jurisdiction of the district court.[22] Id. at 1023-24. Those two factors influenced the D.C. Circuit's decision and they are entirely absent in this case. Indeed, the dissent does not disagree that the defendants' cross-examination of Vixama during her deposition testimony was thorough nor that Vixama *1244 was somewhere outside the Southern District of Florida.
We also discuss the Fifth Circuit's decision in United States v. Tirado-Tirado, 563 F.3d 117 (5th Cir. 2009), because the defendants cite it and the dissent discusses it too. In our view, Tirado-Tirado, if anything, readily demonstrates why the government has shown a good-faith, reasonable effort here. Five months before the defendant's trial, the parties took a videotaped deposition of a witness who everyone expected to return for trial. Id. at 120. The witness gave his contact information to his attorney, was released, and voluntarily returned to Mexico. Id. at 120, 123. Yet, notwithstanding the expectation that this witness would be needed at trial, the government failed to give the witness written notice regarding the trial date and failed to send him a subpoena. Id. at 123.
Reversing, the Fifth Circuit emphasized that (1) the government had not attempted to remain in contact with the alien witness at all during the intervening five months (between the deposition and the trial), and (2) the government "did not make any effort" to contact the witness to make concrete arrangements for his transportation from Mexico to the United States and his attendance at trial until only eight days before trial. Id. at 124-25. The Fifth Circuit concluded that "[t]he failure to make such minimal efforts demonstrates a lack of good faith on the part of the government," and as such, the alien witness was not unavailable for purposes of the Confrontation Clause. Id.
Unlike in Tirado-Tirado, the parties here never anticipated that Vixama would provide live testimony at trial. Rather, they took Vixama's videotaped deposition because she was a material witness in custody (although she herself had committed no crime), and after her deportation she would be unavailable to testify. By contrast, the parties in Tirado-Tirado took the alien witness's deposition only as a precaution, fully expecting that the alien witness would return to testify in person. See id. at 120. Given that understanding in Tirado-Tirado, the government could reasonably be expected to maintain at least some contact with the witness and ensure his appearance at trial. See Tirado-Tirado, 563 F.3d at 120 ; see also Siddiqui, 235 F.3d at 1325.
More importantly, in Tirado-Tirado, the government "made no effort" whatsoever to keep in touch with the alien witness or to remain apprised of his whereabouts in the over five months between the taking of his deposition and the trial. Id. at 125. The government "made no effort" to contact the witness, despite having access to the witness's contact information through his attorney. Id. In contrast, as soon as Agent Nowicki discovered that Vixama had been released in February 2017, he began trying to locate her by contacting her uncle-the only connection Vixama indicated she had in the United States. Later that month (February), at Nowicki's request, ICE ERO agents went to the uncle's house to search for Vixama, and then in March, Nowicki reached out to ICE ERO again to see whether Vixama had turned up. In short, though the rest of the government's efforts to locate Vixama took place in early April, the government here also took earlier steps in February and March to locate her.
In other words, this is not a case in which the government "made absolutely no effort" to locate Vixama and obtain her presence at trial after learning of her mistaken release from custody. See id.; see also Barber, 390 U.S. at 723, 88 S. Ct. at 1321. This is also not a case where the government did nothing to locate or keep in touch with a witness for over five months. The Fifth Circuit's decision even pointed out "[t]he inevitable question of *1245 precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases." Tirado-Tirado, 563 F.3d at 123 (internal quotations marks omitted) (emphasis added).
We agree with the Fifth Circuit that there is no brightline standard applicable to all cases and the facts of each case matter.[23] Reasonableness is a highly fact-specific inquiry. Under the totality of the unique factual circumstances of this case, we conclude that the district court did not err in admitting Vixama's videotaped deposition. The government made multiple good-faith efforts to secure Vixama's presence at trial and its efforts fell within the permissible zone of reasonableness. We are not persuaded by the dissent's position to the contrary.
VII. CONCLUSION
For the foregoing reasons, we affirm Smith's and Delancy's convictions.
AFFIRMED.

The defendants did not require the government to show "exceptional circumstances" under Federal Rule of Criminal Procedure 15(a) to take Vixama's deposition. Rather than having Vixama, an incarcerated material witness, wait in jail until the defendants' trial, the parties agreed she would be deposed and then deported back to Haiti.

The same procedure was followed with Francois. He was held on a material witness complaint, his videotaped deposition was taken with the government, the defendants, and defense counsel present, and then Francois was deported back to Haiti. The only difference as to Vixama is that she was mistakenly released and then absconded from the trial court's jurisdiction.

The boyfriend's name, Florestal Fuegens, is in the record, but his phone number is not. Thus, we do not know the area code of the phone number.

On appeal, neither defendant raises any challenge to their guidelines calculations or to the reasonableness of their sentences.

Section 1324(d) provides for the videotaped deposition of an illegal alien and the admission of that deposition at trial so that the alien witness may be promptly deported and not have to suffer prolonged detention until a defendant's criminal trial. 8 U.S.C. § 1324(d). For the deposition to be admissible, the illegal alien has to be deported by the time of trial. No one disputes that Vixama was to be deported as soon as she gave her deposition.

Because the foreign nationals in Siddiqui were outside the United States, the United States could only request them to appear with perhaps a promise to pay for their travel. Thus, Siddiqui is not instructive here where the witness was physically present in the United States.

While Roberts is a Confrontation Clause case, the Supreme Court has adopted a reasonableness standard for evaluating the government's conduct as to other constitutional rights of a defendant. In doing so, the Supreme Court consistently has emphasized that a reasonableness inquiry is highly fact-specific. See, e.g., United States v. Arvizu, 534 U.S. 266, 273-74, 122 S. Ct. 744, 750-51, 151 L.Ed.2d 740 (2002) (explaining the Supreme Court has "deliberately avoided reducing [reasonableness] to a neat set of legal rules" (internal quotation marks omitted)); Missouri v. McNeely, 569 U.S. 141, 150, 133 S. Ct. 1552, 1559, 185 L.Ed.2d 696 (2013) (explaining "the fact-specific nature of the reasonableness inquiry ... demands that we evaluate each case of alleged exigency based on its own facts and circumstances." (citation and internal quotation marks omitted)); Stephens v. DeGiovanni, 852 F.3d 1298, 1315 (11th Cir. 2017) (stressing the reasonableness standard "requires careful attention to the facts and circumstances of each particular case" (internal quotation marks)); Rodriguez v. Farrell, 280 F.3d 1341, 1346-47 (11th Cir. 2002) (emphasizing "we must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness").

In Roberts, the witness's mother testified that her daughter was traveling outside of Ohio, that she had not heard from her in over a year, and that she and her family knew of no way to reach the witness even in an emergency. Roberts, 448 U.S. at 75, 100 S. Ct. at 2543-44. The prosecutor knew a social worker in San Francisco had called the mother about her daughter, but the prosecutor did not attempt to locate the social worker or daughter in San Francisco. Id. at 75, 100 S. Ct. at 2544. Nonetheless, the Supreme Court concluded the prosecutor's efforts were reasonable.

Smith does not challenge the admission of his prior conviction on appeal. The government also admitted the first page of Delancy's judgment of conviction for his prior illegal reentry case, which also was prosecuted in the West Palm Beach Division. Delancy likewise does not challenge the admission of his prior conviction on appeal.

Delancy's brief purports to adopt Smith's arguments as to this claim "as pertinent to him." Notably, however, Delancy did not object to the prosecutor's closing argument or join Smith's motion for a mistrial. In any event, Delancy's adopted claim fails for the same reasons Smith's does.

To the extent Delancy purports to raise a claim of cumulative error, his claim likewise fails.

Similar to this case, Roberts was a direct appeal with de novo review. In contrast, Hardy involved a 28 U.S.C. § 2254 petition challenging a state conviction, where the Supreme Court applied a deferential review under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254. Yet because the dissent alleges that the majority opinion purportedly failed to heed Hardy's lessons, we likewise explain why the dissent's observation is wrong.

Later on in her dissent, our colleague finally acknowledges that she "do[es] not argue that Vixama did not receive" the trial subpoena from her boyfriend before trial. Dissenting Op. at 1252-53.

It is worth repeating that this is a criminal, immigration-smuggling case and the case agent, Agent Nowicki, worked for Homeland Security Investigations within the Department of Homeland Security. After Vixama was released and not deported, Agent Nowicki appropriately turned to ICE, who had the detainer, for help in locating her and in securing her presence for trial.

See timeline recap in footnote 20, infra.

Although acknowledging that attorney Raben sent the prosecutor the boyfriend's name and phone number on Saturday, April 15, the dissent does not precisely identify what the next steps would be if the government found the boyfriend's address and if it then persuaded him to reveal Vixama's whereabouts. It is unclear whether the dissent is saying the government (1) could then formally serve the trial subpoena on Vixama in Delaware or (2) attempt to take Vixama into custody in Delaware and have her held and transferred back to Miami for trial (during the week of April 17 to 21). So we consider both possibilities.
All of this also assumes that ICE would timely transfer Vixama in custody back to an immigration facility in Miami and then to the custody of the U.S. Marshals' Service for trial. In any event, the dissent's approach-find the boyfriend's address-actually further underscores the reasonableness of the government's efforts to work through Vixama's former lawyer.

The dissent's lecture in footnote four about the obvious and undisputed different jobs, roles, and interests of ICE ERO and the prosecutor is a red herring. The dissent throughout ignores that ICE already had a detainer to take Vixama into custody, the material witness complaint was dismissed after the deposition, and the prosecutor and Agent Nowicki had no pretrial warrant to take Vixama into custody in Delaware; to secure her presence at trial, they would need to ask ICE to help them capture her in Delaware and transfer her back to Miami for trial.
The dissent's suggestion in footnote four-that we should not consider at all the ICE ERO's efforts to locate Vixama in our good-faith effort analysis-also runs afoul of the Supreme Court's clear mandate that we evaluate the reasonableness of the government's efforts to obtain a witness by looking to the totality of the factual circumstances of each particular case. See, e.g., Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (basing its reasonableness determination on all the "facts presented"). In addition, we are loathe to suggest that government agencies cannot work together to accomplish a common goal-here, find Vixama-even if the agencies' ultimate "interests" are not perfectly aligned. The dissent also misapprehends the significance of the ICE ERO agents' trip to Vixama's uncle's house. It is not that the ICE ERO agent's attempt to find Vixama relieved the prosecution of its obligation to make a good-faith effort to obtain her presence at trial. What is significant is that, at the uncle's house, the ICE ERO agents got the runaround from her relatives, who were not helpful at all in assisting them to locate her. Context is important. Because of that interaction, it was manifestly reasonable for the government to reach out to Vixama's former counsel for assistance in trying to find her, rather than again approaching her relatives.

In relevant part, Agent Nowicki's testimony was as follows:
Q: And since April 15th, there have been no attempts to ascertain an address in Delaware by running this gentleman's name?
A: Not by me.
Q: And, basically, the reason for that is because you assumed that she's already given the videotaped deposition, you didn't really need to try to find her?
A: There are various reasons. That's one of them. The other one is there are many issues when it comes to her immigration status and how long-if she's taken into custody, how long it would take the process for her to go from an immigration facility in Delaware to make it to Miami. She'd been made aware of the consequences of not showing up for trial. She had been served with a subpoena. I had attempted to contact the boyfriend on several occasions.
....
Q: Okay. So you were aware that she was missing since-that she had been released into the community since February 6th, but, at that time, you thought that, because the government already had the deposition, that that would be sufficient for trial. Is that correct?
A: That was not my basis for not personally looking for her. She at that point was present in the country illegally. There was no criminal action against her. So she was not my responsibility. So that, combined with knowledge that we do have a video deposition-I guess those were some factors. But I can't point to one factor why I didn't personally go look for her. There are numerous factors.

The dissent's arguments about the burden of proof are unfounded. The majority opinion expressly states: "The Supreme Court has also held that the prosecution bears the burden to show it made a good-faith effort to produce the witness." See supra at 23 (citing Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543 ). Nothing in the majority opinion shifts the burden of proof to the defendants.

Later on, the dissent finally acknowledges that (1) "the government was right to contact Vixama's former attorney" and try to go through him before the trial began, and (2) she does "not argue Vixama did not receive" the trial subpoena from her boyfriend. Dissenting Op. at 1252-53, 1257. But then the dissent mistakenly argues that the government had sufficient time to find the boyfriend's address and locate Vixama during the 5-day trial week. See Dissenting Op. at 1257.
This ignores the timeline about the bench warrant. To recap, the trial subpoena "commanded" Vixama to appear for trial on April 19. On Saturday, April 15, attorney Raben emailed the prosecutor advising that he believed Vixama "will cooperate." The trial began on Monday, April 17, with jury selection that day. On Tuesday, April 18, the jury was sworn and, after opening statements, the government presented four witnesses. On Wednesday, April 19, the government presented seven witnesses. When Vixama did not appear on Wednesday, April 19, the trial court issued the bench warrant that day around noon.
On April 20, the government presented Francois's deposition and two witnesses. After that, the district court held a hearing about Vixama's deposition, found her "unavailable," and concluded the deposition was admissible. On Friday, April 21, the trial resumed at 9:40 a.m., and the government presented Vixama's deposition and rested its case by 11:50 a.m. By approximately 1 p.m., the defense had presented its evidence and also rested.
There was at best a 48-hour window between the issuance of the bench warrant around noon on April 19 and the close of the defendants' evidence around 1 p.m. on April 21. This is why the majority opinion properly focuses on the government's multiple efforts prior to the beginning of the trial to locate Vixama with ICE's help right after her release in February and again in March and then in April to send her the trial subpoena through her former attorney in an effort to have Vixama cooperate and appear for trial.

Because three cases cited by the dissent involved the use of a witness's testimony at a preliminary hearing, the D.C. Circuit's observation that it is less likely that a defendant will vigorously cross-examine an adverse witness at such a proceeding is worth noting. A preliminary hearing is typically held after a defendant has been charged in a complaint, but before the government has obtained an indictment or information. The purpose of a preliminary hearing is to ensure that the government has probable cause to proceed. See Fed. R. Crim. P. 5.1 (a), (e)-(f). Even if the court determines no probable cause exists, that ruling does not preclude the government from later prosecuting the defendant on the same charge. Fed. R. Crim. P. 5.1(f). For that reason, although the defendant has a right to cross-examine all witnesses, Fed. R. Crim. P. 5.1(e), he may often have little incentive to thoroughly cross-examine an adverse witness. Instead of attempting to cast doubt on the witness's testimony, a defendant may instead use his opportunity to question the witness as a means to obtain discovery as to the witness's account and the government's case. And a defendant may be disinclined to aggressively question an adverse witness and thereby reveal his cross-examination strategy in advance of trial.
In stark contrast to a preliminary hearing, defendants in this case knew that Vixama would not be testifying at trial, that her deposition testimony would be presented to the jury, and that this deposition would be their only opportunity to cross-examine her. Although we are dealing here with the question of an absent witness's availability at trial, so were the circuit cases cited by the dissent, and to evaluate fairly the applicability of those cases to our own, we must consider the entire factual context within which their decisions were made.

Beyond the factual distinctions between this case and Lynch, it should also be noted that there was a vigorous dissent in Lynch to the ruling that the government's efforts were insufficient. See Lynch, 499 F.2d at 1025-41 (MacKinnon, J., dissenting).

The dissent charges that the majority opinion creates an "unconstitutionally low (and unpredictable) bar for what constitutes 'reasonable' effort to find a witness." Dissenting Op. at 1246. Not so. For determining reasonableness, the majority opinion eschews brightline rules and follows the fact-specific and case-by-case approach for determining "reasonableness" based on the totality of the circumstances, which is what the Supreme Court has instructed us to do.
Although the dissent cites the circuit cases discussed in this last section, the dissent reproves our summarizations of the facts in Hardy, Roberts, and the above four sister circuit decisions for spending "pages laboriously summarizing the cited cases" and "for what seems like little purpose" to the dissent. Dissenting Op. at 1260 n.10. While the dissent prefers her brightline rule, we explicate these decisions (cited in her dissent) because they each exemplify the fact-specific and case-by-case approach to reasonableness followed by the Supreme Court and other circuits.