NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1132
_____

RICHARD YOUNG,
Appellant

v.

JAMES GRACE, Superintendent SCI Huntingdon;
DISTRICT ATTORNEY OF LACKAWANNA COUNTY;
THE ATTORNEY GENERAL OF THE COMMONWEALTH
OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil Action No. 3-07-cv-00016
(Honorable Thomas I. Vanaskie)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 11, 2013

Before: SCIRICA, AMBRO and FUENTES, *Circuit Judges*.

(Filed: April 30, 2013)

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Richard Young appeals the District Court's order denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We will affirm.

I.

For the purposes of this habeas petition, we focus on a few events relevant to the three claims on which we granted a certificate of appealability:

> (1) the photographic array shown to Harold Litts in 1992 was unduly suggestive and his identification of appellant was unreliable; (2) the admission of Patrick Tigue's prior testimony violated appellant's rights under the Confrontation Clause; and (3) the prosecution (a) did not disclose evidence that appellant could have used to impeach the testimony of Christopher Cornell and (b) knowingly presented Cornell's false testimony.

Order, Jan. 10, 2012.

This case, arising from the murder of Russell Loomis on April 11, 1979, has a long, complicated history. Loomis was scheduled to testify before a grand jury about a fraud scheme involving Richard Young, William Slick, George Cornell, Ronald Hull, and others. *Commonwealth v. Young*, 748 A.2d 166, 172 (Pa. 1999). Loomis had given an investigator "a statement outlining what [the investigator] described as a 'break out' or 'bust out' scheme, whereby [Young] and his co-conspirators would fraudulently obtain merchandise on credit, avoid paying for the goods by concocting a story about it being lost or destroyed, and then sell the merchandise to a fence, or to the public from a discount store." *Id.* On the evening of April 11, 1979, a few days before his scheduled testimony, Loomis disappeared. Loomis's live-in girlfriend "testified that she last spoke with Loomis at about six o'clock on the evening of April 11, 1979, at [Young]'s discount store, where Loomis worked. Loomis told her and others that he had to go with [Young]

2

to retrieve a jeep that was stuck in mud in the woods and that he would be home late. He never returned." *Id.* at 172-73.

Harold Litts lived at the base of a remote mountain in Lackawanna County, Pennsylvania, on which Painter's Creek runs. On the evening of April 11, 1979, Litts and his brother, Gary, heard a person screaming and then gunshots coming from the direction of Painter's Creek. Later that evening, Litts saw a car sitting by the side of the road near his house. The car was parked beside Litts's portable gas tanks, from which hundreds of gallons of gas had recently been stolen. Thinking the car's occupants might be thieves and stealing gas, Litts, together with his brother, drove down the road in a sports utility vehicle past the car and back again at five to ten miles an hour with the headlights on. As Litts was driving past the car, a man stepped towards the SUV, requiring Litts to swerve. Litts then saw another man standing directly behind the car, changing a tire. Litts was focused on the two men. He identified the car as an older Ford with a working trunk light, which he testified caught his eye because trunk lights rarely work in older cars. Litts then drove home and watched the men from his porch for a while.

On the morning of April 14, 1979, two fishermen found Loomis's body lying in Painter's Creek. *Id.* at 173. "Near the body they found a shovel and a come-a-long (a hand operated wrench), which were later identified as having come from [Young]'s discount store. A short distance away, there was an old foundation with a recently dug rectangular hole about the size of a grave. An autopsy revealed that Loomis had three bullet wounds . . . ." *Id.*

Soon after Loomis's body was discovered, the police interviewed Litts, who told

3

them about the Ford car and men he had seen. At trial, Litts testified he told the police that the man standing behind the car "was a sandy blond haired man. . . . I saw his face [and] body shape. And that's what I identified."[1] Within a month or two of the incident, Litts went to the state police barracks and identified the car, based on its type, color and working trunk light.

In 1980, Young was arrested on charges related to the fraud scheme. While on bail, he "precipitously terminated his residency in Pennsylvania and moved to Idaho, where he began living under the assumed name of Todd Devine." *Young*, 748 A.2d at 173, 187. In 1985, a new criminal investigator took over the investigation of Loomis's murder and reinterviewed witnesses, including Litts. The investigator showed Litts a photo array containing at least nine photographs, including those of Young and Slick. Litts identified Slick, whom he described as a large body-builder type, as the man who had stepped towards his car. In 1988, Young was extradited to Pennsylvania. *Id.* at 187.

In 1991, Hull told investigators that he, Young, Slick and George Cornell had participated in Loomis's murder and agreed to testify against the others. In February 1992, the police showed Litts a photo array containing five photographs: one of Slick; two of Young, one of which was a mug shot which had been included in the first array and had tape on it; one of Loomis, which also had tape on it; and one of George Cornell. Litts identified Slick and Young as the men he had seen on April 11, 1979. Hull testified

---

[1] A police report stated Litts had said he did not get a good look at the man standing behind the car, but that he was large in stature. A state trooper and Litts both testified the report had confused the names of Litts and his brother. Litts testified he never told the police he did not get a good look at the man.

before a grand jury that on April 11, 1979, he, Young, Slick, and George Cornell

> lured Loomis into the woods by telling him that they needed help retrieving a jeep that was stuck in the mud. When they arrived at Painter's Creek, Loomis began to walk across a fallen log that was acting as a bridge over the creek, and [Young] shot him in the back. Loomis turned around and attempted to walk back toward [Young], but Cornell grabbed the gun and shot Loomis a second time. Loomis fell, and Cornell shot him again. Hull, [Young], and Slick tried to pull Loomis' body off the log and put it in the grave, but they were unable to extricate it from the debris in the creek, so they left the body where it was. Slick drove away in the jeep, and the others drove away in Loomis' car, a green Ford LTD.

*Id.* at 173. "Hull testified that the undercarriage of the car was damaged as they were leaving the Painter's Creek area, so they stopped to fix it on" the road where Litts saw the car. *Id.* In March 1992, the grand jury indicted Young, Slick, and George Cornell for Loomis's murder.

Young and Slick were tried together.[2] In a 1993 pretrial hearing, Young called to the stand Patrick Tigue, a defense alibi witness, who testified he had bought auto parts from Young and obtained a receipt on the evening of April 11, 1979, the night of the murder. At trial, in 1995, the prosecution called Tigue on cross-examination and confronted him with prison records showing he was incarcerated on that date. The prosecution's "key witness [at trial] was Hull, who testified against the co-defendants in exchange for being allowed to plead guilty to the charge of conspiracy." *Id.* at 187. Young was convicted of first-degree murder and sentenced to death. In 1999, the Pennsylvania Supreme Court found a victim impact statement had been improperly admitted in Young's sentencing hearing and reversed Young's sentence. *Id.* at 185. Upon

5

reargument, in 2000, the Pennsylvania Supreme Court found certain statements of Slick and George Cornell had been improperly admitted at trial and reversed Young's conviction and remanded for a new trial. *Id.* at 194.

At Young's retrial, in 2003, Litts identified Young as a man he had seen on the evening of April 11, 1979. The court admitted Tigue's prior testimony after the detective charged with locating Tigue testified she tried several times to find him by going to his last-known address, but was unsuccessful. The detective also spoke with his sister and her neighbors, and checked with the post office, Lackawanna County Prison, the probation department, the domestic relations department, the welfare department, the bureau of motor vehicles, the district attorney's office, and the Scranton Police Detective Bureau. In its closing argument, the prosecution contended Young's introduction of Tigue's false alibi showed consciousness of guilt.

Also at Young's retrial, the prosecution introduced evidence of an inculpatory statement made by Young while incarcerated in the Lackawanna County Prison. Christopher Cornell, George Cornell's son, testified he was incarcerated in the prison when his father and Young were arrested on March 6, 1992. He testified that, a few days after the arrest, the three men were in Young's cell where he heard Young say to his father regarding the murder case: "[I am] not . . . sinking with this ship alone." Young was again convicted of first-degree murder and sentenced to life imprisonment.

After his conviction, Young subpoenaed Lackawanna County Prison records,

---

[2] The charges against George Cornell were dismissing prior to trial. *Young*, 748 A.2d at 187.

which included several memoranda, to show Young apparently was held in isolation at the time Christopher Cornell testified he heard Young make the inculpatory statement. One memo, dated March 6, 1992, stated Young had been arrested that day, transferred to SCI-Dallas on the prosecution's advice, and then ordered back to Lackawanna County Prison by the court pending a March 9, 1992, hearing on the transfer's legality. Another memo, also dated March 6, 1992, indicated Young would be held in "camera," i.e., isolation, cell 803 until after his transfer hearing or transfer because he was considered a threat to George and Christopher Cornell, both potential witnesses. A third memo, dated March 9, 1992, stated the court had that day "ordered that Richard Young be transferred to the State Correctional Institution at Dallas. His legal work in the cell will be moved from cell 803 . . . to the warden[']s office. This will take place tommorrow [sic] morning." In post-trial proceedings, Frank Chiarelli, a prison security officer, testified that only security staff were supposed to have access to cell 803, but, due to the prison's limited space, inmates held in "camera" cells were not always separated from other inmates. Chiarelli testified Young had access to the law library, and other inmates asked Young legal questions.

Young's direct appeals were denied. The Pennsylvania Superior Court affirmed, the Pennsylvania Supreme Court denied Young's allocator petition, and the U.S. Supreme Court denied his petition for a writ of certiorari. The District Court denied Young's petition for a writ of habeas corpus. As discussed, we granted a certificate of appealability on three claims.

## II.[3]

## A.

"To determine whether an out-of-court identification procedure violated due process," we first "assess whether the police used an identification procedure that was unnecessarily suggestive." *United States v. Shavers*, 693 F.3d 363, 381 (3d Cir. 2012). If it was, we then determine "whether the procedure gave rise to such a substantial likelihood of misidentification that admitting the identification [testimony] would be a denial of due process." *Id.* at 382 (internal quotation marks omitted).

Young contends the 1992 photo array shown to Litts was unduly suggestive because it contained only five photographs, including two of him, one of which was a mug shot included in the 1985 photo array and marked with tape, and one of Slick, whom Litts had identified in the 1985 photo array. Furthermore, he contends the media had disseminated these photographs of Young.

In its initial opinion reversing Young's capital sentence, the Pennsylvania Supreme Court found the photo array not "unduly suggestive," *Young*, 748 A.2d at 178,

---

[3] The District Court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Our review of the District Court decision is plenary because it did not conduct an evidentiary hearing. *Blystone v. Horn*, 664 F.3d 397, 416 (3d Cir. 2011). We review the state court decisions as did the District Court. *Id.* at 416-17. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "imposes a 'highly deferential standard for evaluating state-court rulings'" adjudicating claims on the merits. *Id.* at 417 (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)). We determine only whether such rulings were "'contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States'" or were "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting 28 U.S.C. § 2254(d)). We

employing the proper federal-law standard for suggestiveness, as enunciated by the U.S. Supreme Court. Accordingly, the Pennsylvania Supreme Court adjudicated the claim on the merits, and its opinion is entitled to AEDPA deference. *See Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004) ("[T]he Supreme Court held that qualification for AEDPA deference 'does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state court decision contradicts them.'" (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). Young fails to cite any U.S. Supreme Court case inconsistent with the Pennsylvania Supreme Court's opinion or rationale.

Young points to dicta in *Simmons v. United States* stating there is an increased risk of misidentification "if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." 390 U.S. 377, 383 (1968). But the Court held that showing witnesses six group photographs, several of which included the suspect, was not improper. *Id.* at 385-86. We have held not unduly suggestive an eight-photograph array shown to a witness in a bank robbery investigation that included "one photo the witness ha[d] seen before in the very context of a bank robbery investigation." *United States v. Mathis*, 264 F.3d 321, 331 (3d Cir. 2001). We have cited favorably to cases finding not unduly suggestive "[a] photograph display composed of obvious mug shots" and "the use

review *de novo* legal questions not adjudicated on the merits in state court. *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009).

9

of six photographs in a seven-photo display, including the defendant's, that suggested criminal conduct because the photographs revealed identification tags around the defendants' necks that were concealed by tape." *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

B.

Under the Confrontation Clause, prior testimony may be admitted against a defendant only if the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).[4] "[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724-25 (1968). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Hardy v. Cross*, 132 S. Ct. 490, 494 (2011) (internal quotation marks omitted).

Young contends the detective's search for Tigue was constitutionally insufficient to meet the Confrontation Clause exception. Specifically, he maintains the detective delayed in her investigation, failed to contact Tigue when he was incarcerated, failed to

---

[4] Appellees contend the Confrontation Clause does not apply to Tigue's prior testimony because Tigue was initially Young's alibi witness. But the prosecution introduced Tigue's testimony to show Young's consciousness of guilt. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 (2009) ("The text of the [Sixth] Amendment contemplates two classes of witnesses—those against the defendant and those in his favor. The prosecution *must* produce the former; the defendant *may* call the latter. . . . [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." (footnote omitted)).

review the files containing Tigue's bail records, failed to contact Tigue's relatives other than his sister, and failed to contact Tigue during his court appearances. Appellees counter that the detective did not receive subpoenas to serve until after Tigue was released from prison; that she spoke with a prison official who did not tell her Tigue was out on bail and only had on file Tigue's former address; and that she spoke with Tigue's prosecutors (who were different than Young's), who told her they only had Tigue's former address and could not find him.

The Court of Common Pleas described the detective's search in detail and, applying U.S. Supreme Court cases, found the search was "a good-faith effort." The Pennsylvania Superior Court affirmed, finding the detective had made "reasonable, good faith efforts to locate Tigue." These judgments are entitled to AEDPA deference, and Young fails to cite any U.S. Supreme Court case inconsistent with them. Young compares the search for Tigue with that in *Barber*, but there the Court stated "the State made absolutely no effort to obtain the presence of [the witness] at trial other than to ascertain that he was in a federal prison outside" the jurisdiction. 390 U.S. at 723. In *Hardy*, the Court reversed a Seventh Circuit decision finding search efforts insufficient for failing to contact the witness's current boyfriend, other friends in the area, and former school, and neglecting to serve her with a subpoena after she expressed fear about testifying. 132 S. Ct. at 494. The Court concluded:

> [I]t is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to

11

overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken.

*Id.* at 495 (citation omitted).

## C.

### 1.

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This rule requires prosecutors to disclose known material information favorable to the accused and "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

As noted, post trial, Young subpoenaed prison records that he contends would have impeached Christopher Cornell's testimony citing Young's in-prison statement that "[I am] not . . . sinking with this ship alone." The gravamen of this challenge is that the records show Young was detained in isolation, so the "conversation" never took place.

Young contends the prosecution was required to disclose these records because they also show the prosecution directed the prison to place Young into isolation, so the prison was working on its behalf. But rather than showing the prosecution directed placing Young into isolation, the records actually show the prosecution advised transferring him to SCI-Dallas. Citing *Kyles* and cases following it, the Court of Common Pleas held *Brady* did not require the prosecution to disclose the prison records because it did not possess them and the prison was not a law enforcement agency or otherwise

12

involved in Young's prosecution. The Pennsylvania Superior Court, citing a case following *Kyles*, affirmed on the same bases. These decisions are entitled to AEDPA deference, and Young fails to cite any U.S. Supreme Court case inconsistent with them. We have held *Brady* requires the prosecution to disclose certain evidence in its actual or constructive possession, *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), which does not include "information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *United States v. Pelullo*, 399 F.3d 197, 216 (3d Cir. 2005) (internal quotation marks omitted).

2.

"The Supreme Court has long held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). Establishing this claim requires proving (1) the testimony was false, (2) the prosecution knew or should have known it was false, (3) the testimony went uncorrected, and (4) there is any reasonable likelihood the false testimony could have affected the verdict. *Id.*

Young contends the prosecution knew Christopher Cornell's testimony was false, but introduced it anyway. Young may have procedurally defaulted on this claim by not clearly presenting it to the state courts separately from his *Brady* claim. *See Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001) ("[I]n determining whether a state prisoner has preserved an issue for presentation in a federal habeas petition, 'we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts.'"

13

(quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)).

Assuming Young properly raised the claim, he has not established that Christopher Cornell's testimony was false. Young contends it was false because he was held in a "camera" cell at the time Christopher Cornell testified he heard Young say "[I am] not . . . sinking with this ship alone." But Christopher Cornell testified he was unsure of the date of Young's statement. The prison memos indicate Young was to be placed in a "camera" cell sometime on March 6, 1992, and Young, or at least his legal work, was to be moved from the cell on the morning of March 10, 1992. Young has presented no evidence demonstrating when he was actually in the "camera" cell. Chiarelli testified Young had access to other inmates even while he was in the "camera" cell. Accordingly, it is entirely possible Young spoke with the Cornells before, during, or after he was placed in that cell.

III.

For the foregoing reasons, we will affirm the judgment of the District Court denying Young's petition for a writ of habeas corpus.