******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ROBINSON, C. J., with whom MULLINS, J., joins, concurring in part and dissenting in part. I respectfully disagree with part I of the majority opinion, in which the majority concludes that the state did not engage in a diligent, reasonable, and good faith effort to procure the in-court testimony of a witness, Keisha Parks, at the trial at which the defendant, Horvil F. Lebrick, was convicted of, inter alia, felony murder and home invasion. Given this conclusion, the majority holds that the Appellate Court improperly upheld the trial court's determination that Parks was an unavailable witness and that the admission of her testimony from the defendant's probable cause hearing did not violate the confrontation clause of the sixth amendment to the United States constitution. See *State* v. *Lebrick*, 179 Conn. App. 221, 235–36, 178 A.3d 1064 (2018). In my view, the majority relies on twenty-twenty hindsight to conclude that the state's efforts to find Parks, which utilized comprehensive online resources and on the ground assistance from an investigator with the Kings County District Attorney's Office to look for her at several potential addresses in two boroughs of New York City, were not reasonable. Because I would affirm the judgment of the Appellate Court upholding the judgment of conviction, I respectfully dissent.[1]

By way of background, I agree with the majority's statement of the relevant facts and procedural history. I also agree with the general principles of law stated by the majority, along with its conclusion in part I A of its opinion that whether a witness is unavailable for confrontation clause purposes presents a mixed question of law and fact subject to plenary review.[2] "The [s]ixth [a]mendment's [c]onfrontation [c]lause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' . . . Most of the time, this means that a witness must appear in person and give live testimony at trial if her statements are to be used against the defendant. . . .

"The defendant's right to a [witness'] live testimony in the courtroom serves many important purposes, including allowing the jury to observe closely the [witness'] demeanor, expressions, and intonations, and thereby determine the [witness'] credibility. . . . The [United States] Supreme Court has emphasized that in-court confrontation not only allows the defendant to test the [witness'] recollection, but also compels the witness 'to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' . . .

"Of course, the [United States] Supreme Court has

also told us that the right to a [witness'] presence at trial is not absolute. In [*Crawford* v. *Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the Supreme Court expressly held that the testimony of a witness who does not appear at trial is still admissible, in the constitutional sense, if these two conditions are met: (1) the witness 'was unavailable to testify'; and (2) 'the defendant had had a prior opportunity for cross-examination.' . . . Accordingly, prior cross-examination alone cannot substitute for the defendant's right to live testimony in the courtroom unless the witness meets the [c]onfrontation [c]lause's requirement of 'unavailability.' . . . The integrity of the fact-finding process is at stake because the [c]onfrontation [c]lause is a procedural protection." (Citations omitted.) *United States* v. *Smith*, 928 F.3d 1215, 1226–27 (11th Cir. 2019), cert. denied, 88 U.S.L.W. 3225 (U.S. January 13, 2020) (No. 19-361); see, e.g., *State* v. *Kirby*, 280 Conn. 361, 364 n.1, 908 A.2d 506 (2006) ("[t]he confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment" [internal quotation marks omitted]).

Consistent with the constitutional restrictions under *Crawford*, § 8-6 (1) of the Connecticut Code of Evidence[3] allows for the admission of the "prior testimony of an *unavailable* witness . . . in a subsequent trial as an exception to the hearsay rule. . . . The two part test for the admissibility of such testimony is as follows: First . . . [t]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. . . . Even after the declarant is satisfactorily shown to be unavailable, his statement is admissible only if it bears adequate indicia of reliability . . . which serve to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. . . .

"In *State* v. *Frye*, 182 Conn. 476, 480–81, 438 A.2d 735 (1980), we identified five of the most common situations in which the declarant will be deemed unavailable for the purposes of certain hearsay exceptions. The situation relevant here states: the declarant is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . *by process or other reasonable means*. . . . In interpreting reasonable means, we have held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 61–62, 602 A.2d 571 (1992); see, e.g., *Hardy* v. *Cross*, 565 U.S. 65, 69, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011); *Ohio* v. *Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled on other grounds by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Barber* v. *Page*, 390 U.S. 719, 724–25, 88 S. Ct. 1318, 20 L. Ed. 2d 255

(1968); *State* v. *Wright*, 107 Conn. App. 85, 89–90, 943 A.2d 1159, cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008).

"To take advantage of the hearsay exceptions requiring unavailability, the proponent must show a good faith, genuine effort to procure the declarant's attendance by process or other reasonable means. . . . This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance." (Citations omitted.) *State* v. *Lopez*, 239 Conn. 56, 75, 681 A.2d 950 (1996). "A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence." Id., 77–78; accord *State* v. *Wright*, supra, 107 Conn. App. 90. "[T]here is no [bright line] rule for reasonableness, and . . . a reasonableness inquiry necessarily is [fact specific] and examines the totality of the factual circumstances of each particular case." *United States* v. *Smith*, supra, 928 F.3d 1228; see, e.g., *Cook* v. *McKune*, 323 F.3d 825, 835 (10th Cir. 2003) (noting that there is no "per se rule defining the measures that the prosecution must take before a witness can be deemed unavailable" [internal quotation marks omitted]). "Simply put, the [c]onfrontation [c]lause does not require the government to make every conceivable effort to locate a witness; it requires only a [good faith] effort that is reasonable under all of the circumstances of the case. . . . As the [United States] Supreme Court has told us, [o]ne, in hindsight, may always think of other things. . . . [G]reat improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." (Citations omitted; internal quotation marks omitted.) *United States* v. *Smith*, supra, 1230. "At bottom, a reasonable, [good faith] effort is [case specific] and contextually driven." Id.

As the majority explains, four factors guide the determination of whether the state's efforts to procure the attendance of the witness were reasonable, namely (1) "the more crucial the witness, the greater the effort required to secure his attendance," (2) "the more serious the crime for which the defendant is being tried, the greater the effort the [state] should put forth to produce the witness at trial," (3) "where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger," and (4) whether the state made "the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." *Cook* v. *McKune*, supra, 323 F.3d

835–36. In my view, these factors reflect the prosecutor's important role as a "minister of justice"; Rules of Professional Conduct 3.8, commentary; who is "not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 612, 65 A.3d 503 (2013).

I agree with the majority that Parks was a critical witness to the state's case because, as the fiancée of one of the defendant's accomplices, she would have testified to the defendant's confession that he kicked in the door to the apartment, disarmed the victim, and shot his way out. It is beyond cavil that the defendant was charged with extremely serious crimes, including felony murder and home invasion, which left him exposed to a life sentence. I also agree that Parks had no special reason to favor the prosecution, insofar as there is no indication that she stood to benefit personally from testifying in this case.

I part company from the majority with respect to its analysis of the fourth factor, which considers the reasonableness of the search in light of the efforts that the state would have made if it did not have Parks' prior testimony available. In contrast to the majority's view of the state's efforts, my review of the record leads me to conclude that the state's efforts were competent and reasonable rather than perfunctory and inadequate. Emory L. Hightower, the inspector with the state's criminal justice division in the Hartford state's attorney's office who was tasked with finding Parks, commenced his efforts at the end of August, 2014, approximately two months prior to the defendant's trial. Hightower began his investigation by reviewing police reports and memoranda in the state's case file for Parks' contact information, and he unsuccessfully called the telephone numbers contained in the file. He then searched for Parks in the local Hartford police database to determine whether she had had some "police contact" locally, and he also searched for her in the National Crime Information Center (NCIC) database, which is maintained by the Federal Bureau of Investigation but run locally by the Connecticut State Police and contains criminal and motor vehicle records. Hightower's criminal records searches also included searches for pending matters and other police contacts in both Connecticut and Parks' home state of New York. These searches were unsuccessful.

With his criminal records searches bearing no fruit, Hightower then utilized the CLEAR database system, which is a search engine provided by the Thomson Reuters Corporation that searches public records on a state by state basis. As explained by Erin Tiernam, a CLEAR product specialist employed by the Thomson

Reuters Corporation, CLEAR is a "data aggregator" that pulls from numerous public records "to search for people, to [perform] due diligence on people, [and to] get detailed background information, those types of things." In connection with a "person search," CLEAR uses a person's name and date of birth to locate them via credit header information from credit reporting agencies, utility hookups for cable, gas, and electric services, death records, civil court records, property records, and motor vehicle registrations.[4] Hightower testified that his CLEAR search revealed contact information for Parks in New York that was current through 2013, the year before trial, including several telephone numbers and addresses.

Moving offline, Hightower turned to the New York addresses and telephone numbers that he had found via his CLEAR search. He called the numbers and learned that they were either no longer in service or no longer receiving calls. Hightower learned that Parks' last known address was an apartment located at 819 East 22nd Street in Brooklyn, New York, that her address before that was an apartment at 108–09 159th Street in the Jamaica neighborhood of Queens, New York, and that her mother lived in an apartment at 1169 Flatbush Avenue in Brooklyn.[5] Hightower then forwarded the addresses and telephone numbers to the Office of the Kings County District Attorney, which sent one of its investigators, Frank Garguilo, to locate Parks at those addresses and to serve her with a subpoena.

At 12:30 p.m. on Thursday, September 25, 2014, Garguilo went to the first Brooklyn address, 819 East 22nd Street, and discovered a large house divided into several apartments. He testified that a young woman from an upstairs apartment let him into the building, and he knocked on the door of the apartment believed to belong to Parks, receiving no answer. Garguilo then went back to his car and called one of the provided telephone numbers, getting a voicemail recording belonging to a "Miriam Augustine." He then left a voicemail message but received no return call. Garguilo then drove to 1169 Flatbush Avenue, another Brooklyn address that Hightower identified as belonging to Parks' mother. Garguilo knocked on that door and found no one home. Later that day, at approximately 5 p.m., Garguilo returned to the East 22nd Street address and again checked unsuccessfully for Parks.

The following morning, Friday, September 26, 2014, Garguilo made a third visit to the East 22nd Street address, which was similarly unsuccessful. That morning, he also tried calling the telephone number again, but he received the same voicemail recording. He then attempted to locate Parks by driving to the secondary address that Hightower had provided in the Jamaica section of Queens; that address was for another large single family home that had been divided into apart-

ments. Garguilo testified that no one was home in any of those apartments. Garguilo further testified that no one had answered the door at any of the locations that he had visited, leaving him unable to request more information from neighbors, which is his ordinary practice when looking for someone. Garguilo testified that his approach also was consistent with the policy directive of the Kings County District Attorney's Office, which was to follow the information provided by the agency that had requested assistance rather than to conduct an independent investigation.

I conclude that the efforts undertaken by the state through Hightower's investigation, which started online and finished with Garguilo's on the ground efforts in Brooklyn and Queens, are solidly on the spectrum of those deemed to be reasonable and in good faith by Connecticut and federal courts.[6] See, e.g., *State* v. *Rivera*, supra, 221 Conn. 62–67 (trial court did not abuse its discretion in determining that state had demonstrated that two witnesses who had left Connecticut for Massachusetts and Puerto Rico were unavailable for trial when state's investigator, with assistance from numerous out of state agencies, used criminal, corrections, and labor department databases to discover witnesses' aliases and identification numbers, and state's failure to contact one of witness' brothers was not unreasonable because it might have narrowed investigation but would not "necessarily have found her"); *State* v. *Smith*, 112 Conn. App. 592, 596–98, 963 A.2d 104 (finding good faith, reasonable, and diligent effort when state's inspector called home of nonappearing witness who resided in judicial district and received message that number was not in service, left unreturned messages over multiple days on her cell phone "at varying hours of the day and evening," and visited her home twice and place of employment once, where her boss indicated that she could not reach her), cert. denied, 291 Conn. 912, 969 A.2d 176 (2009); *State* v. *Wright*, supra, 107 Conn. App. 91 (good faith, reasonable and diligent effort when state's inspector looked for witness over nine days, reviewed databases with driver's license and motor vehicle information, checked national and local civil and criminal databases, identified witness' social security number, and physically visited all addresses in Bridgeport and New Haven found in searches for witness, his mother, and his brother); *State* v. *Miller*, 56 Conn. App. 191, 194–95, 742 A.2d 402 (1999) (unavailability of witnesses "satisfactorily proved" when investigator checked witnesses' addresses with motor vehicles department, visited those addresses two weeks before trial, and learned from individuals at those addresses that witnesses had all moved out of state), cert. denied, 252 Conn. 937, 747 A.2d 4 (2000); *State* v. *Sanchez*, 25 Conn. App. 21, 24–25, 592 A.2d 413 (1991) (reasonable good faith efforts to locate juvenile witness, who had been ordered transported to airport for flight

to Puerto Rico upon her release from custody, when state contacted investigator for juvenile court from public defender's office and juvenile division probation officer, probation office did not know witness' whereabouts, and investigator unsuccessfully attempted to contact witness' out of state grandmother both by telephone and through welfare office); see also *Hardy* v. *Cross*, supra, 565 U.S. 67–71 (state's efforts to secure presence of missing sexual assault victim were reasonable when investigators visited her home every three days at different times, visited and interviewed her relatives and former boyfriend's family, and checked local hospitals, jails, medical examiner, immigration, and post office, and state's failure to check with her friends or current boyfriend was not unreasonable because persons interviewed earlier provided no reason to think that those individuals would have information about witness' whereabouts); *United States* v. *Smith*, supra, 928 F.3d 1229–31 (government made good faith efforts to locate undocumented immigrant witness, who had been mistakenly released from custody and had fled from jurisdiction of trial court, by having immigration agents search address that she previously had provided, contacting attorney who had represented her on material witness complaint, and trying to communicate with her by calling and sending text messages to her boyfriend's cell phone); *Evans* v. *Lindsey*, Docket No. 19-1394, 2019 WL 3214661, *3 (6th Cir. July 10, 2019) (state court reasonably concluded that witness was unavailable when, after testifying at preliminary hearing, "[the detective] personally served [her] at her residence with a subpoena for trial," she appeared in person for first day of trial but then "expressed fear about testifying and thereafter refused to answer or respond to [the detective's] numerous phone calls and voicemails," and detective went to her "residence multiple times, and checked another address, but was unable to locate [the witness]," whose husband "indicated that [she] was afraid and had left without stating where she was going," even though detective did not check "other locations, such as hospitals and jails"); *Acosta* v. *Raemisch*, 877 F.3d 918, 929–31 (10th Cir. 2017) (state court reasonably concluded that prosecution engaged in good faith efforts to produce witness at trial when investigator visited her last known addresses, checked with post office to see whether she had filed change of address form, "obtained information from 'various sources' indicating [that the witness] had no permanent residence, lived on the streets, and was in hiding to avoid testifying," and engaged assistance from other investigative units, despite state's failure to contact relatives other than her grandfather or to check arrest records, which would have revealed recent arrest), cert. denied, U.S.    , 139 S. Ct. 321, 202 L. Ed. 2d 220 (2018); *Young* v. *Grace*, 525 Fed. Appx. 153, 156–59 (3d Cir. 2013) (state court reasonably concluded that state police detective made good faith effort to find witness by going to his

last known address several times, speaking with his sister, and checking in with numerous local law enforcement agencies, post office, welfare department, and department of motor vehicles), cert. denied sub nom. *Young* v. *Bickell*, 571 U.S. 1241, 134 S. Ct. 1499, 188 L. Ed. 2d 382 (2014); *Mermer* v. *McDowell*, Docket No. CV 16-932-VAP(E), 2016 WL 5329623, *19–22 (C.D. Cal. August 15, 2016) (reasonable efforts when detectives engaged assistance from multiple law enforcement agencies in region, checked multiple databases, continuously monitored arraignments, visited and surveilled home of witness' father, and went to three other locations where witness had been seen), report and recommendation accepted and adopted, 2016 WL 5329560 (C.D. Cal. September 21, 2016).

I respectfully disagree with the majority's criticisms of the state's online and on the ground efforts as "anemic," "perfunctory," and "unenthusiastic," and, therefore, insufficient to satisfy the good faith and reasonableness standards required by the confrontation clause. The state's efforts in this case bear none of the hallmarks that courts have deemed unreasonable, namely, a complete dereliction of the duty to search, refusing to follow unmistakably obvious leads, or failing to react to obvious warning signs that a witness intended to disappear. Beyond cases featuring a complete absence of an effort to search,[7] a paradigmatic example of an unconstitutionally low effort is found in *Brooks* v. *United States*, 39 A.3d 873 (D.C. 2012), in which the District of Columbia Court of Appeals deemed unreasonable the government's efforts to find a witness who had fled from the courthouse prior to testifying at trial. Id., 879. Although the government had tried "overnight, unsuccessfully, to contact her through family and former addresses" and called local hospitals and jails the next day, the court deemed these efforts unreasonable on the basis of its assumption that the witness was likely still in the vicinity. Id., 887. The court emphasized that the prosecutor had rejected the suggestion of defense counsel and *specifically refused* to check in neighboring Virginia, where the witness had been arrested in the past, or to contact her attorney for assistance, even though she had expressly stated to the prosecutor that "she needed to see her lawyer during the lunch break . . . . Instead, the prosecutor declared he had 'no expectation' that she could be found." Id., 888. The court observed that "[w]hat the situation demanded . . . was an intensification of efforts, a [doubling down], to search for and locate the witness, even if it required more than an overnight continuance of the trial. In short, this is unlike prior cases, in which we have held that in the absence of evidence that there was any possibility of locating [the missing witness], no matter how remote, we cannot say that the government failed to meet its good faith effort requirement." (Internal quotation marks omitted.) Id.

The court stated that, although it was "mindful that the government can face real challenges in dealing with witnesses who may be unwilling to testify for any number of reasons, some of them understandable and compelling," the "government's efforts were pro forma and plainly inadequate in light of [the witness'] demonstrated reluctance and her importance to the government's case. It is difficult to imagine, in this prosecution dependent on a sole eyewitness, that this lackadaisical approach was equally as vigorous as that which the government would [have] undertake[n] to prevent [the witness] from disappearing had it not had her prior testimony. . . . We can only infer that the government's vigilance had relaxed and only minimal steps were taken to present her live testimony at [the] appellant's second trial once [the witness'] prior testimony was in hand. . . . [Half measures] do not satisfy . . . the [c]onfrontation [c]lause or the evidentiary requirement that the witness be unavailable before prior recorded testimony may be admitted." (Citations omitted; internal quotation marks omitted.) Id.

Other cases holding efforts to locate a witness to be unreasonable involve similarly perfunctory efforts that consist of nothing more than going through the motions, with a record showing promising stones left unturned. See, e.g., *Cook* v. *McKune*, supra, 323 F.3d 825, 836–40 (finding state's efforts to locate witness, who was "vital" to first degree murder trial and who had received immunity from prosecution, to be unreasonable, "perfunctory," and lacking good faith when state had engaged in "heroic" efforts to contact witness while he was hitchhiking in California and Mexico before receiving his former testimony but relied on "gentlemen's agreement" to have him return for trial and declined to pay his travel expenses in advance, despite knowing that he was "nomadic" and indigent, and refused to charge him with aiding and abetting after he failed to appear); *United States* v. *Quinn*, 901 F.2d 522, 528 (6th Cir. 1990) (finding government's efforts to locate critical witness, who lived locally, to be "negligible" and "singularly unenthusiastic" when search was initiated on Thursday before Monday trial, government presented no evidence that it checked public records or attempted to find forwarding address after being told by witness' neighbor that she recently had moved, and, after being informed that witness was at her mother's house, United States marshal merely drove by without stopping); *People* v. *Cromer*, 24 Cal. 4th 889, 903–904, 15 P.3d 243, 103 Cal. Rptr. 2d 23 (2001) (unreasonable efforts when state did not begin to seek witness, who had been reported to have disappeared months before, until just before trial, visited her former residence several times, and, after receiving tip that witness was living locally with her mother, delayed for two days before visiting mother's house once and leaving subpoena there); *People* v. *Bean*, 457 Mich. 677, 687–90,

580 N.W.2d 390 (1998) (state failed to exercise due diligence when its efforts to locate witness were limited to unsuccessful telephone calls, it failed to check for change of address form, match telephone numbers of witness' relatives to addresses or check public agency records, and it took "no steps whatsoever" to contact authorities in the District of Columbia, where neighbors and relatives informed investigators that witness had moved with his mother); *Hernandez* v. *State*, 124 Nev. 639, 649–52, 188 P.3d 1126 (2008) (efforts to procure attendance of out of state witness after she failed to appear for trial were not reasonable when state called her home, spoke only to child who mentioned family emergency but did not speak to witness or other adult to ascertain length of her absence or ability to return to Nevada, and did not seek continuance to obtain such information or to secure witness' attendance); *State* v. *Harris*, 279 Or. App. 446, 455–57, 379 P.3d 539 (2016) (after reluctant teenage witness in family violence case failed to appear in court despite being subpoenaed, "the state made *no* further effort to locate her or to compel her attendance at trial," "did not attempt to locate [the witness] through her mother, who was present at the courthouse, or through other relatives or law enforcement; [and] it did not send or even propose to send law enforcement to get her" or request continuance for that purpose [emphasis in original]), rev'd on other grounds, 362 Or. 55, 404 P.3d 926 (2017);[8] *State* v. *King*, 287 Wis. 2d 756, 768–69, 706 N.W.2d 181 (App.) (holding that it was unreasonable for state to opt to "persuade" witness to come to court rather than to serve her with subpoena when she was available, especially when state conceded that it had wrong address for seven prior attempts at service and had failed to serve her after being informed by victim's advocate that witness believed that she did not have to come to court without subpoena), review denied, 286 Wis. 2d 662, 708 N.W.2d 694 (2005); cf. *State* v. *King*, 622 N.W.2d 800, 807–808 (Minn. 2001) (reserving decision about availability but expressing concern that state had agreed to witness' release after his guilty plea, when plea testimony contained incriminating statements about defendant, and "expended minimal efforts" to find witness, as state did not contact witness' court services worker until after trial started, that worker made only single telephone call to witness, and state failed to contact witness' mother or spouse, who lived locally).

In contrast to these cases demonstrating a constitutionally inadequate effort to find a witness, I agree with the Appellate Court that the state's online and offline efforts in this case were reasonable and consistent with the prosecutor's obligation to provide procedural justice, even though the efforts were "not exhaustive." *State* v. *Lebrick*, supra, 179 Conn. App. 231–32. After his search of criminal and law enforcement records in Connecticut and New York was unsuccessful, High-

tower utilized the CLEAR "data aggregator," which he understood from his training and experience to be a comprehensive resource, for his online search of numerous public and private records.[9] That online search identified several potential addresses in Brooklyn and Queens where Parks might be found, which Garguilo then checked multiple times to no avail, with the other residents at those locations not answering the door to furnish additional leads to Garguilo. There is no evidence that Garguilo or Hightower ignored potential leads; Parks did not want to be found, and their searches of available locations simply brought them to dead ends. Although Parks was a reluctant witness, there is no claim that the state could or should have acted peremptorily because of an indication that she planned to disappear or refuse to testify. See *People* v. *Fuiava*, 53 Cal. 4th 622, 676, 269 P.3d 568, 137 Cal. Rptr. 3d 147 ("[W]e could not properly impose upon the [p]eople an obligation to keep periodic tabs on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the [p]eople could impose upon a witness who plans to leave the state, or simply disappear, long before a trial date is set." [Internal quotation marks omitted.]), cert. denied, 568 U.S. 1069, 133 S. Ct. 788, 184 L. Ed. 2d 583 (2012). Put differently, the majority's assessment of the state's efforts to the contrary runs afoul of the maxim that "the question of whether an effort to locate a missing witness has been sufficiently diligent to declare that person unavailable is one that is inherently fact specific and always vulnerable to criticism, due to the fact that [o]ne, in hindsight, may always think of other things." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 221 Conn. 67; see *Ohio* v. *Roberts*, supra, 448 U.S. 75–76. Accordingly, I conclude that the Appellate Court properly upheld the trial court's determination that Parks was an unavailable witness for purposes of the confrontation clause and § 8-6 (1) of the Connecticut Code of Evidence.

Because I would affirm the judgment of the Appellate Court, I respectfully concur in part and dissent in part.

[1] I agree with part II of the majority opinion, in which the majority concludes that the admission of the testimony of James Stephenson, the state's expert witness on firearm and tool mark identification, did not violate the confrontation clause.

[2] In the absence of confrontation clause concerns, for evidentiary purposes under § 8-6 of the Connecticut Code of Evidence, "[t]he trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters." (Internal quotation marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 62, 602 A.2d 571 (1992).

[3] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former

hearing. . . ."

[4] I disagree with the majority's assertion that "[t]he evidence indicates that Hightower's [CLEAR] search did not encompass 'detailed reports like lawsuits, liens, [and] judgments' or 'social media information' " because there is no specific evidence as to which CLEAR subscription level was available to Hightower. This criticism is not supported by the record. First, although Tiernam testified that she did not know which subscription level the state had purchased in this case, she also stated that CLEAR's "basic" subscription level "includes what we would call our location services, which would include all the credit headers, utility hookups, kind of *the finding people information*," with the second level providing "more detailed reports like . . . lawsuits, liens, judgements, [and] criminal records." (Emphasis added.) Second, consistent with Tiernam's description of CLEAR, Hightower testified that, on the basis of his training and experience, he understood CLEAR to "[list] any public document" and to provide access to the data contained therein about civil proceedings, such as information about public assistance and child support benefits. This evidence supports an inference that the state—even in these challenging fiscal times—opted for the higher level subscription to CLEAR.

I acknowledge, however, that there were several electronic sources that Hightower was unable to search. Although Hightower had access to credit headers via CLEAR, he did not have access to the underlying credit reports or—in the absence of a subpoena—to banking records. He also did not have access to Facebook or other social media sites from his office computer, and it is not apparent from the record whether the state's subscription to CLEAR included the "web analytic search" function, which, according to Tiernam, searches items such as "Facebook pages, LinkedIn pages, and also just somebody's general presence on the web."

Finally, Hightower also testified that there was no national database that he could access that would allow him to see whether Parks was receiving federal public benefits or payments from the Internal Revenue Service. Hightower also did not inquire with immigration authorities; he testified that he did not know whether Parks was Jamaican, like the defendant and other individuals involved in the case.

[5] Hightower testified that he did not know whether Parks owned or rented her residences at those locations, and he did not do any additional research to determine whether she had a landlord.

[6] The reasonableness of the state's efforts is also supported by on point case law from our sister states. See, e.g., *People* v. *Valencia*, 43 Cal. 4th 268, 292–93, 180 P.3d 351, 74 Cal. Rptr. 3d 605 (finding good faith efforts to locate helpful, but not critical, witness when investigator started search several months before trial, called telephone number witness had provided in police report, attempted to obtain new telephone number through telephone company, checked addresses contained in motor vehicles records and spoke to persons at those addresses, and reviewed criminal, credit, real estate, and civil court records), cert. denied, 555 U.S. 891, 129 S. Ct. 198, 172 L. Ed. 2d 158 (2008); *Berkman* v. *State*, 976 N.E.2d 68, 76–77 (Ind. App. 2012) (efforts were reasonable when state, which learned that witness had left Indiana for Florida while attempting to serve him with subpoena, believed that witness was evading existing arrest warrants in Indiana and was unable to contact him by telephone, even though state did not send investigator to Florida because record did not reflect that state had possible address for witness there), transfer denied, 984 N.E.2d 221 (Ind.), cert. denied, 571 U.S. 863, 134 S. Ct. 155, 187 L. Ed. 2d 109 (2013); *Commonwealth* v. *Robinson*, 451 Mass. 672, 675–77, 888 N.E.2d 926 (2008) (commonwealth engaged in good faith efforts to locate witness, despite failure to search for him in New Jersey where he reportedly had gone without leaving address or telephone number, because he had outstanding arrest warrants in Massachusetts and would be unlikely to return voluntarily, and investigators had checked other potential addresses for him in Massachusetts and Rhode Island); *State* v. *Trice*, 292 Neb. 482, 486, 495, 874 N.W.2d 286 (2016) (efforts to serve out of state witness were reasonable when they "began well in advance of trial and continued up to the time of trial" and involved "considerable coordination with [out of state] authorities," who had visited witness' address and learned from his parents only that he had left Nebraska, with no other information about his location provided); *State* v. *Bailey*, 163 N.C. App. 84, 91, 592 S.E.2d 738 (finding good faith efforts from evidence that "law enforcement officers tried to subpoena [the witness] at the address they were given, and called several phone numbers [for him] provided by" another witness), appeal dismissed, 358 N.C. 733, 601 S.E.2d 861 (2004);

*State* v. *Brown*, 744 A.2d 831, 835–37 (R.I. 2000) (state engaged in good faith search for previously cooperative, subpoenaed witness who failed to appear for trial when police from two towns unsuccessfully searched for him at addresses where he might have been staying, repeatedly paged witness, inquired of family members and neighbors, and checked hospitals and detention facilities throughout state); *State* v. *Jones*, 568 S.W.3d 101, 129–30 (Tenn.) (state made good faith effort to find critical witness in capital homicide case by contacting multiple jurisdictions in Florida, where witness was believed to be living, publishing his photograph in Florida newspaper, and, after obtaining his telephone number from his mother, calling witness, who indicated that he would not return to Tennessee to testify), cert. denied,

U.S.    , 140 S. Ct. 262, 205 L. Ed. 2d 144 (2019); *State* v. *Garner*, Docket No. 2016AP2201-CR, 2018 WL 1837088, *3–5 (Wis. App. April 17, 2018) (state made reasonable efforts to locate witness, who had fled her pretrial services program after testing positive for drugs, because she had willingly testified at first trial and had given no indication that she would not testify at second trial, and multiple police investigative units conducted local searches for her over four days, including checking with her grandmother and following up on leads suggested by defense counsel and witness' own attorney), review denied, 383 Wis. 2d 624, 918 N.W.2d 431 (2018).

[7] See, e.g., *Barber* v. *Page*, supra, 390 U.S. 720, 723–25 (state "made absolutely no effort" to bring witness to testify in person, despite knowledge that witness was in federal prison approximately 200 miles away); *Earhart* v. *Konteh*, 589 F.3d 337, 345–46 (6th Cir. 2009) (unreasonable efforts when state did not seek to compel attendance of minor witness at sexual assault trial, "even though it knew exactly where [she] was," namely, on vacation with her family, which constituted "complete lack of effort"), cert. denied, 562 U.S. 874, 131 S. Ct. 178, 178 L. Ed. 2d 107 (2010); *Jackson* v. *Brown*, 513 F.3d 1057, 1083–84 (9th Cir. 2008) (search for one witness was not diligent when detective made no effort to locate him until several weeks into trial because "he was 'too busy and he hadn't had really any time to check it out,' " but search was diligent as to second witness, who had been subpoenaed prior to trial and then released from custody, when officer "repeatedly checked" to see if she had been rearrested "under any of her aliases" and repeatedly visited "the street corner where she was allegedly working . . . to no avail"); *Whelchel* v. *Washington*, 232 F.3d 1197, 1209 (9th Cir. 2000) (state made no effort to seek attendance of witness who was being transferred out of state by his employer); *United States* v. *Mann*, 590 F.2d 361, 367–68 (1st Cir. 1978) (finding no good faith efforts when government misused rule 15 [a] of Federal Rules of Criminal Procedure by allowing key witness, who was juvenile Australian citizen, to leave Puerto Rico for Australia); *Abreu* v. *State*, 804 So. 2d 442, 444 (Fla. App. 2001) (finding that "the state made no effort to secure [the witness'] attendance at trial" despite its awareness that "[the witness] may have been reluctant to attend the second trial because he did not care for his earlier hotel accommodations"), aff'd, 837 So. 2d 400 (Fla. 2003); *State* v. *Nobles*, 357 N.C. 433, 441, 584 S.E.2d 765 (2003) ("the present record does not demonstrate that [the witness] was even contacted for purposes of determining her availability to testify at [the] defendant's capital sentencing proceeding"); *State* v. *Workman*, 171 Ohio App. 3d 89, 95–96, 869 N.E.2d 713 (2007) (single attempt to serve local witness with subpoena at her home on morning of trial, with no other evidence offered about witness' unavailability or state's efforts to locate her, was not diligent effort).

[8] The Oregon Supreme Court reversed on the issue of unavailability, but only because the defendant "objected to a continuance that would have enabled the state to pursue other means of securing [the] witness." *State* v. *Harris*, 362 Or. 55, 57, 66–67, 404 P.3d 926 (2017).

[9] The majority takes issue with Hightower's failure to conduct a basic Google or social media search for Parks, as well as his decision to rely on a search of the databases available through CLEAR once his searches in the Hartford Police Department and NCIC databases were unsuccessful. Although the majority's aspersion sounds good at first, given that the word "Google" is sufficiently ubiquitous as to be both noun and verb, it ultimately is not a fair criticism of Hightower's efforts, given the lack of evidence to establish that a standard Google search would have revealed any more information about Park's whereabouts than the databases searched even under a "basic" subscription to CLEAR. See footnote 4 of this opinion.